NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-09850


COMMONWEALTH  vs.  GREGORY A. WALL.



Norfolk.     May 9, 2014. - September 11, 2014.

Present:  Ireland, C.J., Spina, Cordy, Gants, Duffly, JJ.[1]


Homicide.  Intoxication.  Malice.  Evidence, Intoxication,
     Telephone conversation, Relevancy and materiality,
     Inflammatory evidence, State of mind, Impeachment of
     credibility, Medical record.  Witness, Impeachment.
     Practice, Criminal, Capital case, State of mind, Assistance
     of counsel, Instructions to jury, Objections to jury
     instructions.  Constitutional Law, Public trial.




     Indictment found and returned in the Superior Court
Department on May 30, 2002.

     The case was tried before Judith Fabricant, J.; a motion
for a new trial, filed on November 16, 2009, was heard by her;
and a second motion for a new trial, filed on January 11, 2013,
was considered by her.


     Matthew A. Kamholtz for the defendant.
     Tracey A. Cusick, Assistant District Attorney, for the
Commonwealth.


---

[1] Chief Justice Ireland participated in the deliberation on
this case prior to his retirement.

CORDY, J.  Just before midnight on May 3, 2002, police responded to 16 Sumner Street in Quincy after a neighbor telephoned to report that she had just witnessed the defendant, Gregory A. Wall, moving a trash barrel with a human leg protruding from it across their shared backyard.  On arrival, the officers observed a trail of red droplets leading to the defendant's back door.  Through a window in the door, one of the officers observed the legs of someone standing next to a plastic bag containing two human feet.  On entering the apartment, the officers discovered a horrific scene.  A woman's body had been dismembered.  The defendant was found moments later in his bedroom closet, his clothes and hands stained with the victim's blood.  He would give several explanations to police, generally claiming that, after the victim came to his apartment, he passed out due to his consumption of alcohol and prescription medication (Ativan) and woke up to find the victim dead.  He was taken to the Quincy Medical Center for observation, where doctors determined that his blood alcohol content (BAC) was 0.21 per cent.

The defendant was charged with murder in the first degree, and the Commonwealth proceeded on theories of premeditation,

extreme atrocity or cruelty, and felony-murder.[2]  Defense counsel, relying on evidence of the defendant's intoxication and statements the defendant made to police, alleged that a third party -- most likely the victim's boy friend -- entered the house and killed the victim while the defendant was unconscious due to severe intoxication, and that the defendant merely panicked and attempted to clean up the scene after waking up to the sight of the aftermath of the murder.  After a six-day trial, the defendant was convicted of murder in the first degree on the theories of premeditation and extreme atrocity or cruelty.

On appeal, the defendant raises numerous claims of error. He contends that the trial judge abused her discretion in admitting in evidence recorded telephone calls made on the day of the murder between the defendant and his girl friend, Linda Reid, who was incarcerated at the time; that a medical record containing the preliminary "urine toxicology screen," which showed that he tested negative for any drugs, was erroneously admitted; that counsel was ineffective in failing to object to the admission of the toxicology report and failing to use a prior inconsistent statement to impeach Reid on her unfounded assertion that there was no Ativan in the house at the time of

---

[2] The Commonwealth presented evidence that the defendant had had sex with the victim and alleged that the murder was committed in the course of an uncharged aggravated rape.

the murder; that the trial judge erred in instructing the jury that there is no "legal limit" of intoxication for any purposes other than determining whether one is guilty of operating a motor vehicle while under the influence of alcohol; and that his right to a public trial was violated when his uncle was prevented from entering the court room during jury empanelment. For the reasons stated below, we find no reversible error, and discern no basis to exercise our authority under G. L. c. 278, § 33E, to reduce or reverse the verdict. As a result, we affirm the defendant's conviction.

1. Background. We summarize the facts the jury could have found, in the light most favorable to the Commonwealth. Commonwealth v. Sanna, 424 Mass. 92, 93 (1997).

a. The murder. The victim arrived at the Quincy Adams Restaurant in Quincy at approximately 1 P.M. on May 3, 2002. Catriona Craig, a bartender at the restaurant, had known the victim as a customer for two years. The victim's boy friend, Evan Baker, whom Craig also had known for over one year, was already in the restaurant playing the game Keno. The victim sat on the other side of the bar from Baker, and the two argued a bit without speaking directly to one another, using Craig as an intermediary.

At approximately 2 P.M., the defendant entered the restaurant and sat with the victim at the bar. The two sat

together for the entirety of the defendant's stay and struck up a conversation.  Baker never spoke to either the defendant or the victim.  The defendant left the bar between 3:30 and 4 P.M., the victim left a few minutes later, and Baker left a minute after that.  Baker returned ten minutes later, alone, to play Keno for another ten minutes before leaving.

The defendant lived at 16 Sumner Street with his girl friend, Linda Reid, who had been incarcerated the previous week. At 4:30 P.M., Joshua Delong, a resident of 18 Sumner Street, saw the defendant return to the building and enter his apartment with a woman he would later identify as the victim.

Delong lived with his mother, Shirley Folsom (Shirley), and his two brothers.  At the time of the murder, Shirley's sister, Donna Hons, and brother-in-law were visiting and staying in the apartment across the hall from Shirley's.  That apartment was directly above the defendant's apartment.

At approximately 6 P.M., Shirley and her family went out to dinner.  When they returned around 9 P.M., members of the family heard loud banging noises emanating from the defendant's apartment, which occurred continuously until 11 P.M.  Shortly thereafter, Hons heard noises coming from outside and looked out the window to see the defendant dragging a barrel through the back yard.  She watched as he covered the barrel with a blanket and tried unsuccessfully to lift it into a nearby shopping cart.

After watching for a while, she went to get Shirley, who then observed the defendant dragging a barrel with a human leg protruding from it, prompting her to call the police.

Officers David Levine and John Michael McGovern of the Quincy police department responded to the scene at 11:56 P.M. They proceeded to the back yard, where they found a pile of garbage bags. After speaking with one of the witnesses, they rummaged through the trash barrels in the backyard, finding clothing covered in reddish stains. They also noticed a similarly stained shower curtain in a shopping cart near the barrels and a trail of droplets of a red substance leading to the rear door of the house.

The two officers separated, with Levine staying in the rear of the house and McGovern heading to the front. Levine proceeded up to the rear doorway. Looking downward through a window in the rear door,[3] he saw what appeared to be two human feet sticking out of a plastic shopping bag. He also saw the legs of someone -- presumably the defendant -- standing by the feet. He announced his presence and ordered the door open. The defendant said "hold on," and ran from the room.

---

[3] Officer Levine described the rear door as "a wooden door with a window in the middle with an interior curtain across." He was able to look down through the space between the curtain and the door to see a small portion of the room.

Levine forced his way into the apartment and went directly into the kitchen, where he saw the victim's body in a garbage barrel.  She was placed in the barrel head-first, with her legs in the air.  Her body had been dismembered, with part of her legs cut off.  A blood-stained hacksaw subsequently was found in the barrel with the victim.

Meanwhile, Officer McGovern heard a commotion and returned to the back of the building in time to see Levine break into the apartment.  He radioed for assistance and returned to the front door, which he kicked in.  Several officers arrived moments later and undertook a search of the apartment.  The defendant was found hiding in a bedroom closet with the victim's blood on his hands and clothes.[4]  He was ordered to the floor and arrested.  Sergeant Charles E. Santoro immediately read the defendant the Miranda warnings, which the defendant indicated he understood.  He told Santoro that the person in the barrel was a woman, and that he had taken "all kinds of pills."

The medical examiner who performed the victim's autopsy testified that the victim suffered through a series of brutal injuries before her death.  He determined that there were ten lacerations caused by blunt trauma to her head.  Though he could not testify as to what caused the trauma, a broken hammer with

---

[4] Forensic testing confirmed that the blood on his hands and clothes was either the victim's blood or a mixture that included the victim's blood.

human hair stuck to it was found in a trash barrel taken from the backyard.[5]  The victim had abrasions on her nose, a black eye, and bruises on her arms, hands, and shoulders.  Three fingers on her left hand and one on her right hand had been pulled off while she was still alive, with one finger on her left hand hanging on by the skin.  She also suffered three stab wounds to her left abdomen, one of which perforated her small intestine.  The medical examiner determined her cause of death to be a combination of the blunt head trauma, abdominal stab wounds, and traumatic amputation to her fingers.  Postmortem, she suffered a ten-inch long, five- to six-inch deep cut to her right femur and the total amputation of both legs below the knee.

b.  The defendant's statements.  At the booking station, the defendant made a telephone call to his mother that Officer David Santosuosso was able to overhear.[6]  He told her that he had met a woman earlier in the day, that she had come back to his apartment, and that a man may have come back with her.  He said that he was either "blacked out" or "whacked out," and told her that he was charged with murder.  He later called her again, at

---

[5] The barrel also contained clothing, a knife, and a human finger.

[6] The defendant told officers that he wished to call his mother, although they had no way of confirming the identity of the person to whom he actually spoke.

which point Lieutenant John Sullivan overheard him say, "They think I killed her, I don't know how she got there, I just woke up and she was there."[7]

After he was booked, the defendant spoke to several police officers and detectives and gave conflicting versions of the events leading to the murder. He told Detective Chris McDermott that he met the victim and her boy friend (whose name he could not recall) at the Quincy Adams restaurant, invited both of them to his apartment, went home alone, and apparently fell asleep. He claimed that he woke up to the sound of them arguing in his kitchen, and his next memory was being ordered out of the closet by police. When asked what happened to the woman found in his apartment, he said that he did not hurt her, but that he "just tried to get rid of it."

He told Detective Robert Curtis that he went to the Quincy Adams restaurant, had about four beers, and spoke to the victim, whom he knew only as Cathy. He went on to say that he invited the victim to his house, went home alone, and that she arrived some time later, alone. He said that her boy friend arrived after that, and the three had a friendly interaction. Later, he

---

[7] The defendant also told Officer Brian Mahoney while being booked that he had taken some Ativan that night. The information was relayed to Lieutenant Sullivan, who decided to call an ambulance to get the defendant medical attention. He was taken to the Quincy Medical Center and observed for several hours, after which he was returned to the police station at approximately 5:30 A.M.

told Curtis that the victim and her boy friend arrived at his house unexpectedly. But he also stated that he invited the victim to his house and told her she could bring her boy friend. In the end, he claimed that he did not remember what had happened that night, and that he was woken up by the arrival of the police. When Curtis pointed out the inconsistencies in the versions of events he had given, the defendant said that he did not remember his first two explanations and smiled.

The defendant also spoke to State police Trooper Brian Brooks. The defendant first claimed that he invited the victim and her boy friend to his apartment, but then went to his apartment alone and fell asleep. He later recanted and said that he had invited only the victim, who took it on herself to invite her boy friend. He went on to state that he and the victim had consensual sex,[8] that her boy friend came over an hour later, and that he fell asleep in his living room while the victim and her boy friend talked in the kitchen. He claimed that the next thing he remembered was "waking up seeing the mess and the Quincy police at the door."

c. The defense. The defendant pursued a third-party culprit defense. His primary theory was that he had been

---

[8] The defendant initially denied that he had had sex with the victim, before eventually admitting to Trooper Brian Brooks that he had, a fact that subsequently was confirmed by forensic testing.

unconscious during the murder due to severe intoxication from drug and alcohol use, and that another person, likely Baker, entered the house and killed the victim while he slept.[9] Although he did not explicitly argue it to the jury, his secondary theory was that if he had killed the victim, he was so intoxicated as to be unable to form the mental state required for murder, as evidenced by defense counsel's request for an intoxication instruction.

On July 27, 2005, after a six-day trial and less than one day of deliberations, the defendant was convicted of murder in the first degree on the theories of premeditation and extreme atrocity or cruelty. He was sentenced to life imprisonment without the possibility of parole.

---

[9] In response to this argument, the Commonwealth presented evidence that, on May 4, 2002, police seized the pants, socks, sneakers, shirt, and cap that Baker was wearing on the night of the murder, and that each item tested negative for the presence of human blood. It also called Baker as a witness. Baker testified that he went to the Quincy Adams Restaurant at 3:30 P.M. to pick the victim up for dinner; that the victim returned to the bar shortly after they left together; that he returned to the bar several times -- both alone and with his mother, Marion Baker (Marion) -- to look for the victim; and that he finally went home at around 8:30 P.M. Both the bartender, Catriona Craig, and Marion corroborated Baker's account that he returned to the bar several times, with Craig testifying that he was at the bar at 8:30 P.M., that he had not changed his clothing, and that there was no blood on his clothing. Finally, Marion testified that Baker was home when she went to bed around 7 P.M. and woke up at 10 P.M., and that she did not hear anyone leave the house in between those times.

The defendant's first motion for a new trial was filed on November 16, 2009, and denied on May 27, 2010. On January 11, 2013, the defendant filed a second motion for a new trial,[10] alleging for the first time that the court room was closed to his uncle during jury empanelment. The trial judge deemed the issue waived in a written decision and order on May 30, 2013, and took no action on the defendant's argument. This is the consolidated appeal of the defendant's direct appeal and his appeal of the trial judge's denial of both motions for a new trial.

We address other salient facts as they arise below.

2. Discussion. a. Recorded telephone conversations. The defendant argues that the judge erred in admitting several recorded telephone conversations made on the day of the murder between himself and Reid.

Before Reid's testimony, the prosecutor stated an intention to play five tape-recorded telephone conversations between Reid and the defendant. These conversations were not being offered for the truth of what was said, but only to rebut the defendant's contention that he was severely intoxicated to the point of unconsciousness around the time of the murder, by

---

[10] Although the defendant characterizes the motion as a supplemental motion for new trial, we consider it to be a second motion for new trial, where the defendant advanced three new arguments that were not raised in his initial 124-page motion for a new trial and memorandum in support thereof.

allowing the jurors "to hear him, what his voice sounds like."
Defense counsel strenuously objected, arguing that, although
"[t]here are no admissions," "[h]e sounds like a lonesome
lover. . . . I don't think he shows himself in a particularly
good light." He went on to contend that Reid "chastises him
throughout the conversations. She is chastising him for not
doing what she wants, for being drunk, for drinking, for doing
one thing or another." The judge overruled the defendant's
objection and allowed the Commonwealth to introduce the
recordings through Reid.

After the second recording was played, the judge instructed
the jury that the recordings were admitted only to allow the
jurors "an opportunity to hear the defendant's voice at the time
and to evaluate his mental and emotional condition . . . . and
condition of sobriety at the time of the conversations."[11] After
a recess, defense counsel again objected to their introduction
and filed a written motion for a mistrial. He argued that
"[t]his tape recording has been brought before the jury for one

---

[11] The prosecutor conceded that the telephone conversations
contained statements showing that the defendant took a check
addressed to Reid, cashed it, and spent some of the money on
alcohol, but explained that there was no way to edit that
portion of the tape, and the judge instructed the jury not to
consider the statement for the truth of the matter asserted.

thing and one thing only, to show what a low life my client is."
The judge denied the motion.[12]

Reid testified that the first telephone call was placed at
approximately 10 A.M. on the day of the murder.  She described
the defendant as sober and coherent at that time.  The second
call was placed between noon and 3 P.M.  Reid testified that the
defendant was drunk at that time.  In this conversation, and
indeed in the remainder of the conversations, Reid repeatedly
chastised the defendant for being intoxicated, for failing to
assist her in her efforts to secure release from prison, and for
spending her paycheck, which she had earmarked for legal
services and rent, on alcohol.  The third call was placed after
6 P.M., the fourth at about 6:45 P.M., and the final call at
8:45 P.M.  On the last four calls, the defendant sounds
intoxicated, yet coherent and responsive.

The defendant argues that the recordings should not have
been admitted, because they amounted to an "assault against
[his] character, with repeated references to his being a drunk,
a liar, and a thief."  Because the error is preserved, we review
for prejudicial error.  Commonwealth v. Flebotte, 417 Mass. 348,

---

[12] The judge did note that the first recording revealed that
the defendant was on probation at the time, and offered to
address the issue with the jury; defense counsel was disinclined
to bring further attention to the matter, and no curative
instruction was given.

353 (1994).  We conclude that the judge did not abuse her discretion in allowing the recordings to be played.

Massachusetts law accords relevance a liberal definition. Commonwealth v. Sicari, 434 Mass. 732, 750 (2001), cert. denied, 534 U.S. 1142 (2002), quoting Commonwealth v. LaCorte, 373 Mass. 700, 702 (1977) ("rational tendency to prove an issue in the case").  See Commonwealth v. Vitello, 376 Mass. 426, 440 (1978), overruled on other grounds by Commonwealth v. Mendes, 406 Mass. 201 (1989), and cases cited ("renders the desired inference more probable than it would be without the evidence").  Relevant evidence is admissible as long as the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.  Commonwealth v. Keo, 467 Mass. 25, 32 (2014), quoting Commonwealth v. Smiley, 431 Mass. 477, 484 (2000). "Whether evidence is relevant in any particular instance, and whether the probative value of relevant evidence is outweighed by its prejudicial effect, are questions within the sound discretion of the judge."  Commonwealth v. Marrero, 427 Mass. 65, 67-68 (1998), quoting Commonwealth v. Valentin, 420 Mass. 263, 270 (1995).

The relevance of the first recording -- a call that was placed to Reid at approximately 10 A.M. on the morning of the murder -- well before the defendant met the victim at the Quincy Adams Restaurant -- and in which the defendant was apparently

sober, may seem marginal.  It is not relevant to his consciousness, sobriety, or general state of mind during the events leading to the victim's murder.  However, its relevance is in establishing a base line for the jury regarding the defendant's speech and voice patterns when he is sober, a base line that may have been useful to them for comparison purposes with the defendant's later calls.  The defendant comes across during the conversation as sober, coherent, and devoted to Reid.  The conversation is amicable, the two do not argue, and Reid does not accuse the defendant of lying or stealing.  While the call does reveal that the defendant was on probation at the time, the jury were not likely to have believed that the defendant was guilty of a horrific murder by virtue of being on probation for an unknown offense.  In addition, the judge offered to give a limiting instruction on the matter, which defense counsel declined.  We see no abuse of discretion in these circumstances.

The remaining four calls are plainly relevant to show the defendant's "mental state at or about the time of the homicide, so as to respond to the defendant's contention that he was so impaired by alcohol or drugs as to be incapable of forming the intent necessary for the crime, as well as his contention that he was unconscious when someone else killed the victim."

The second call was placed between noon and 3 P.M., a time frame which encompasses his initial meeting with the victim at the Quincy Adams Restaurant.  His level of intoxication beginning at that time was highly relevant to the Commonwealth's theory -- that he was not so intoxicated as to be unable to commit the murder or form the required mental state for malice. The final three recordings were even more plainly relevant. According to Delong, the defendant returned to his apartment with the victim at 4:30 P.M., well before the third call was placed by Reid at 6 P.M.  Thus, the three calls captured a time period where the defendant and the victim were at his apartment, a time period where the murder may well have taken place.[13] Combined with Hons's testimony that she heard loud noises coming from the defendant's apartment between 8:15 P.M. and 11 P.M.; testimony from Hons and Shirley that the defendant was moving trash barrels at 11 P.M.; testimony from Kathleen McLaughlin, Reid's friend, affirming that she spoke to the defendant on the telephone between 8:30 and 8:45 P.M.;[14] and testimony from Linda Reid's mother stating that she received a telephone call from the defendant's apartment at 10:25 P.M., the recordings were

---

[13] The medical examiner was unable to determine either the time of injury or the time of death with any specificity.

[14] Kathleen McLaughlin testified that the defendant "wasn't totally drunk," and that he "wasn't in a bad mood.  He was calm. He just didn't sound like someone that had been drinking a lot."

relevant to show that the defendant's assertion that he was unconscious when the murder took place was a fabrication.  They also allowed the jury to assess his coherence at the time, in order to determine whether he was capable of forming the required mental state for malice.

To be sure, the final four recordings do not paint the defendant in an especially positive light.  However, they do not suggest that the defendant had a propensity for violence of any kind, and certainly not the type of violence that would soon occur at his apartment.  To the contrary, the picture painted by the recordings was largely consistent with defense counsel's portrayal of the defendant.  Defense counsel's opening statement characterized the defendant as an alcoholic, and described him as "a drunk, a whimpering sort of fellow . . . a patsy."  He began his closing by asking the jury, "Did you listen to that tape with Greg Wall and Ms. Reid?  Did you hear Greg Wall?  Was that the sound of a killer or a wimp?"  His strategy at trial was to color the defendant as a drunk who was unwittingly caught in the middle of a domestic dispute between Baker and the victim.  The recordings are more in line with the defendant's theory of the case than with an overt suggestion that the defendant was a man capable of the violence inflicted on the victim.

In any event, any prejudice was cured by the judge's extensive instructions to consider the recordings only regarding the defendant's mental and emotional state at the time, and her instructions to ignore references to the defendant's alleged cashing of Reid's paycheck. See Commonwealth v. Sylvia, 456 Mass. 182, 195 (2010), citing Commonwealth v. Pope, 406 Mass. 581, 588 (1990) (jury presumed to have followed judge's instructions). We therefore conclude that, although the judge erred in allowing the first recording in evidence, the rest were properly admitted, and the probative value of the calls readily outweighed any prejudicial effect.

b. Impeachment of Reid. The defendant also argues that his defense counsel was ineffective for failing to impeach Reid on her testimony that the defendant did not have Ativan in their apartment at the time of the murder. We disagree.

As noted above, both of the defendant's theories of the case rested on the premise that he was severely intoxicated at the time of the murder, specifically due to his professed use of alcohol and Ativan. Pursuant to that defense, on cross-examination, defense counsel elicited testimony from Reid suggesting that the defendant was a heavy drinker, and that he was severely intoxicated during the final four telephone conversations. Regarding the conversation at 6 P.M., counsel asked Reid whether the two spoke about drugs. She responded

that "[h]e was looking for Ativan in the house." She added that he used Ativan whenever she "didn't throw them out on him," and testified that she often threw them out "[b]ecause he was crazy when he was taking them." She then added, "[t]here was none in the house at that time."

The defendant contends, correctly, that Reid could not possibly have known with any certainty whether there was any Ativan in the house, given that she had been incarcerated since April 28.[15] He also notes that Reid's testimony directly contradicted a statement she made to Dr. Ira K. Packer, a psychologist from Bridgewater State Hospital who examined the defendant with respect to his criminal responsibility before trial.[16] According to Dr. Packer's report, which was not in evidence, Reid told him that, on the night of the murder, she called the defendant at approximately 9 P.M. Packer noted that "[Reid] indicated that he seemed 'buzzed' and reported that he

---

[15] Although the details of Reid's incarceration are not in the record, Detective Robert Curtis testified that both Reid and the defendant were placed in protective custody for intoxication on April 28, 2002. He added that, because Reid was on probation on an unrelated matter, she was transferred to the Massachusetts Correctional Institute at Framingham the next day. The defendant was released.

[16] The examination of the defendant's criminal responsibility was ordered by the judge. The defendant did not pursue a defense of not guilty by reason of mental disease or defect, and thus Dr. Ira K. Packer did not testify.

had drunk between six and twelve beers plus having taken some pills."

Defense counsel did not impeach Reid with either her statement to Dr. Packer or the commonsense notion that she could not be sure whether there were pills in the house because she had been incarcerated for five days. Indeed, he did not question Reid's statement in any way. He later affirmed that he did not have a strategic reason for his failure to cross-examine Reid on the issue.

"Counsel is ineffective where his conduct falls 'below that which might be expected from an ordinary fallible lawyer' and prejudices the defendant by depriving him 'of an otherwise available, substantial ground of defence.'" Commonwealth v. Lavoie, 464 Mass. 83, 89, cert. denied, 133 S. Ct. 2356 (2013), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). Generally, even on the more favorable standard of review under § 33E, "failure to impeach a witness does not amount to ineffective assistance of counsel." Commonwealth v. Fisher, 433 Mass. 340, 357 (2001). Commonwealth v. Bart B., 424 Mass. 911, 916 (1997). "[A]bsent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion." Fisher, supra.

The defendant has failed to meet his burden. First, the jury were informed that Reid was incarcerated at the time of the murder, and listened to five telephone calls, each of which began with a recorded statement that the call was being placed from a correctional institution. The jury were likely able to discern that Reid did not have personal knowledge of the presence of Ativan in the house on May 2 without counsel cross-examining her on the matter.

Second, Reid's testimony does not directly contradict her statement to Dr. Packer. She merely told Dr. Packer that the defendant took some "pills," which were not necessarily Ativan. Further, the introduction of Dr. Packer's report to refute Reid's testimony was fraught with risks, as the record before us includes several statements from Reid which would reflect poorly on the defendant.[17,18]

Finally, even if defense counsel's failure to cross-examine Reid on the issue fell below the standards expected of an

---

[17] For example, Reid told Dr. Packer that the defendant threatened to kill his landlord by "knocking him in the head, cutting him up, and throwing him in the ocean" due to the defendant's jealousy over the landlord's interactions with Reid. The defendant also allegedly woke her one night and "had an evil look and said if [Reid] ever cheated on him he'd beat [her] within an inch of [her] life."

[18] Although the Commonwealth asserts that Dr. Packer concluded in his report that the defendant was criminally responsible, that portion of the report is not before us. However, if the Commonwealth is correct, we cannot say that defense counsel erred in opting not to introduce such evidence.

ordinary, fallible lawyer, the defendant still would not have been materially prejudiced.  The weight of the evidence against the defendant was overwhelming, where he was seen dragging a garbage barrel containing a leg through his back yard and was later found hiding in his closet, covered in blood from the dismembered body in his kitchen, offering only the defense that he had slept through a brutal murder committed by a third party and attempted to dispose of the evidence.  Further, the defendant offered no expert testimony on the nature or effects of Ativan in support of his theory that it contributed to his intoxication.  See Commonwealth v. Green, 408 Mass. 48, 50-51 (1990) (expert testimony required to prove codeine is opium derivative).  Thus, there is no reason to believe that the jury's verdict was swayed by Reid's plainly unfounded speculation that there was no Ativan in the house at the time of the murder.

    c.  Toxicology report.  The defendant also argues that the admission of preliminary negative toxicology results in a medical record was improper.  He did not object to the admission of the record.  Consequently, we review his claim only to determine whether any error created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Francis, 450 Mass. 132, 138 (2007).  While the report was admitted erroneously, we

find no such likelihood, and thus reject the defendant's argument.

In a continuing effort to show the defendant's alleged intoxication at the time of the murder, defense counsel asked nearly every witness that came into contact with the defendant in the hours before and after the crime whether the defendant appeared to be intoxicated. With one exception,[19] every witness testified either that the witness did not notice whether the defendant appeared to be intoxicated or that he did not appear to be impaired.

In order to bolster his argument, the defendant moved at sidebar to offer the first page of the medical record from his stay at the Quincy Medical Center. The proffered portion of the record showed that the defendant's serum alcohol, as measured at 2 A.M. on May 4, 2002, was 243, which the parties stipulated was equivalent to a BAC of 0.21 per cent as measured by a breathalyzer. It also contained a note that there was "[a]lcohol on [the defendant's] breath."

---

[19] Officer John McGovern testified that the defendant appeared sober when he was arrested. However, he would later admit on cross-examination that the defendant was "barely coherent," "confused," and "not mak[ing] a lot of sense," and described his eyes as "bugged out." No other witness testified that the defendant smelled of alcohol or looked or acted intoxicated on the night in question, despite defense counsel's repeated questions on the matter.

In response to the defendant's proffer, the prosecutor said, "I'm going to put in the whole [medical record], so why don't we just put the whole thing in?"  Defense counsel did not object and the entire medical record, consisting of eleven pages including laboratory results, was admitted in evidence.

The defendant's medical record also contained the results of a toxicology screen.  Because the defendant self-reported that he had taken Ativan pills, a urine test for drugs was performed.  The toxicology screen report stated that defendant tested negative for benzodiazepines,[20] amphetamine, cocaine, "tetrahydo," tricyclic antidepressants, barbiturates, and opiates.  The report contained a disclaimer, however, noting that "[u]rine results are presumptive based only on screening methods, and they have not been confirmed by a second independent chemical method.  These results should be used only by physicians to render diagnosis or treatment or to monitor progress of medical conditions."  The medical record also contained clinician's notes from an examination of the defendant, stating that, "his urine toxicology screen was negative for [Ativan]," and another note reading, "Drug screen: Negative (including for benzodiazepines)."[21]

---

[20] Ativan is a brand name for lorazepam, a benzodiazepine.

The defendant now argues that the portions of the record pertaining to his negative drug test were not presumptively reliable and therefore inadmissible. We agree that had there been an objection, the portion of the records in question would not have properly been admitted, but we conclude that there was no substantial likelihood of a miscarriage of justice arising from their admission.

"Records kept by hospitals . . . may be admitted . . . as evidence in the courts of the Commonwealth so far as such records relate to the treatment and medical history of such cases." G. L. c. 233, § 79. "[T]he statute allows admission of the substantive content of hospital records because of the presumption of reliability which attaches to statements relating to treatment and medical history in these records." Bouchie v. Murray, 376 Mass. 524, 527-528 (1978). See Commonwealth v. Irene, 462 Mass. 600, 612, cert. denied, 133 S. Ct. 487 (2012), quoting Doyle v. Dong, 412 Mass. 682, 685 (1992) ("we have considered the contents of hospital records to be reliable, 'because the entries relating to treatment and medical history are routinely made by those responsible for making accurate entries and are relied on in the course of treating patients'"). Section 79 was enacted "primarily to relieve the physicians and

---

[21] The drug screen note was on the summary report prepared by the treating clinician, just below the results of the serum alcohol text.

nurses of public hospitals from the hardship and inconvenience of attending court as witnesses to facts which ordinarily would be found recorded in the hospital books." Commonwealth v. Gogan, 389 Mass. 255, 263 (1983), quoting Leonard v. Boston Elevated Ry., 234 Mass. 480, 482 (1920).

However, "[t]he statute is not to be interpreted as rendering admissible all the contents of hospital records; rather the medical records exception statute makes admissible only those portions of records relating to treatment and medical history which possess the characteristics justifying the presumption of reliability." Bouchie, 376 Mass. at 528. Pursuant to the four-part test announced in Bouchie, supra at 531, in determining whether material contained in a hospital record is admissible, we must consider whether: (1) the document is the type of record contemplated by G. L. c. 233, § 79; (2) the information is germane to the patient's treatment or medical history; (3) the information was recorded from the personal knowledge of the entrant or from a compilation of the personal knowledge of those who are under a medical obligation to transmit such information; and (4) the statements contained in the record are inadmissible as third-party hearsay statements not within any exception.

The record here would initially seem to fall well within the parameters of the Bouchie test, as there is no doubt that

the medical personnel obtained and recorded the results of the toxicology screen for the purpose of treating the defendant's self-reported drug ingestion. However, the defendant points us to two Appeals Court cases concluding that toxicology reports in markedly similar circumstances were inadmissible. In Commonwealth v. Lampron, 65 Mass. App. Ct. 340, 344 (2005), a preliminary toxicology report was held to be inadmissible where it contained a disclaimer indicating that "[p]ositive results of screening tests are not confirmed." The same was true in Commonwealth v. Johnson, 59 Mass. App. Ct. 164, 167-168 (2003), where the record indicated that "a second [test] must be used to obtain a confirmed analytical result." In both cases, the disclaimers "call[ed] the reliability of the test into sufficient question as to create doubt as to whether the record alone can stand competent as proof of the medical facts recited therein." Id. at 168.

We conclude that the presumption of reliability that attaches to the content of hospital records is defeated where the record explicitly indicates that the results of a toxicology screen are "presumptive based only on screening methods and have not been confirmed by a second independent chemical method." The Commonwealth's argument that it could have introduced the results of the drug screen through the testimony of uncalled medical personnel is unavailing. The fact that the report

hypothetically could have been introduced in another way does not alter the fact that the medical record as introduced was inadmissible hearsay. We are further unmoved by the fact that Lampron and Johnson were cases where the presence of drugs were elements of the charged offenses.

Despite the error, the defendant suffered no risk of a miscarriage of justice where the weight of the evidence against him was overwhelming, and the improper evidence was cumulative on the issue of the credibility of his story.[22]

d. Intoxication instruction. The defendant argues that the judge erred in instructing the jury that the presumption of intoxication present where the charge is operating under the influence was inapplicable to this case. Where the defendant objected at trial, we review for prejudicial error. Flebotte, 417 Mass. at 353. Because the instruction was an accurate statement of the law, we affirm.

Given that the crux of his defense was an argument that he was too intoxicated to have killed the victim, the defendant

---

[22] The defendant also argues that defense counsel was ineffective for agreeing to the introduction of the preliminary toxicology report. For the reasons stated above, counsel could not have been ineffective where the admission of the report did not create a substantial likelihood of a miscarriage of justice. See Commonwealth v. Wright, 411 Mass. 678, 682 (1992) (where on review pursuant to G. L. c. 278, § 33E, defendant fails "to show . . . that, as to an unpreserved claim of error, there is a substantial likelihood of a miscarriage of justice, he would not prevail by asserting as to the same issue the ineffectiveness of his counsel").

elicited a great deal of testimony regarding his BAC, which was measured at the hospital as 0.21 per cent.  He asked nearly every police officer about their experiences with intoxicated drivers and the legal presumption that a person with a BAC of 0.08 per cent or above is intoxicated for the purposes of the statute criminalizing operating a vehicle while intoxicated, G. L. c. 90, § 24 (1) (a) (1).  In closing, defense counsel stated:

> "that hospital record you will take a look at, I am sure, and you will see that his blood serum alcohol was 243, and there is a stipulation which we agree and thus you must accept it, that that means [0].21 on a breathalyzer -- and you heard a lot of conversations between myself and those officers about what 0.08 meant in terms of the need to arrest somebody who blows that in a breathalyzer for operating under a motor vehicle and legal drunk and the rest of it. You know that [0].21 is almost three times higher than the legal limit.  You know that he was very much under the influence of alcohol."

As requested by defense counsel, the judge instructed the jury on the issue of intoxication:

> "[Y]ou may consider any credible evidence of the defendant's consumption of alcohol or other drugs in determining whether the defendant deliberately premeditated the killing of the deceased, that is whether the defendant thought before he acted and whether the defendant reached the decision to kill after reflection at least for a short period of time.  You may also consider those circumstances . . . in determining whether the defendant intended to kill and with respect to the issue of malice for purposes of the theory of first degree murder based on extreme atrocity or cruelty. . . . You may also consider those circumstances in determining whether the defendant acted in a cruel or atrocious manner in causing the death of the deceased.  I reiterate that whenever the Commonwealth must prove that the defendant intended to do something or had knowledge of

certain facts or circumstances, in order to prove the
crime, you may consider any evidence of intoxication in
determining whether the Commonwealth has met its burden of
proving the defendant's intent or knowledge."

Immediately after her instruction on intoxication, the

judge, sua sponte, gave a limiting instruction:

"Now, I want to clarify one point.  In this case, you heard
various references to a legal limit with respect to
operation of a motor vehicle.  And I want to just clarify
something on that topic.  In Massachusetts, the law is that
it is unlawful to operate a motor vehicle with a blood
alcohol content of .08 or more.  That is what is referred
to by the legal limit for purposes of operating a motor
vehicle.  There is no such legal limit for any other
purpose other than for purposes of operating a motor
vehicle."

The defendant objected to the instruction, arguing that it

"diminished the defendant's proof of intoxication."

A trial judge has the duty to state the applicable law

clearly and correctly.  Commonwealth v. Corcione, 364 Mass. 611,

618 (1974), and cases cited.  "In assessing the sufficiency of

the jury instructions, we consider the charge in its entirety,

to determine the 'probable impact, appraised realistically . . .

upon the jury's factfinding function.'"  Commonwealth v.

Batchelder, 407 Mass. 752, 759 (1990), quoting Commonwealth v.

Richards, 384 Mass. 396, 399-400 (1981).

The defendant does not argue -- and we discern no reason to

conclude -- that the judge's instructions on the elements of

murder or intoxication were inaccurate.  Instead, he merely

argues that the judge's supplemental instruction that the "legal

limit" for intoxication repeatedly referenced pertained only to charges of operating a motor vehicle while under the influence was erroneous. We disagree.

First, the judge's instruction was legally and factually accurate. The only "legal limit" recognized by the Commonwealth in the context of criminal conduct is the presumption of intoxication when driving an automobile with a BAC of 0.08 per cent or above. The defendant argues that the "legal limit" also appears in G. L. c. 111B, § 8 -- the incapacitated person statute -- which provides that a person is presumed intoxicated if a breathalyzer examination shows his BAC to be 0.1 per cent or higher, and that the person shall then "be placed in protected custody at a police station or transferred to a facility." Although he is correct, the incapacitated person statute is not a criminal statute, and specifically provides that a person placed in protected custody "shall not be considered to have been arrested or to have been charged with any crime." G. L. c. 111B, § 8. Thus, the judge's instruction was accurate.

The instruction also was not misleading. Contrary to the defendant's argument, the judge did not "dilute both the intoxication instruction . . . and the evidence of intoxication." The judge did not suggest that the defendant was not intoxicated. She simply, and correctly, informed the jury

that the defendant's BAC was not dispositive proof of intoxication for the purposes of determining whether he acted with malice aforethought, as it would be in a case charging a defendant with operating a motor vehicle while under the influence.  She did not suggest in any way that the defendant was not impaired.

Further, the judge's instruction did not preclude the jury from concluding that the defendant was severely intoxicated. The "effects of liquor upon the mind and actions of men are well known to everybody."  Commonwealth v. Taylor, 263 Mass. 356, 362 (1928).  It was repeatedly put before the jury, by means of a stipulation by the parties, that the defendant's BAC was 0.21 per cent.  Defense counsel ably elicited testimony from several police officers opining that, in their experience, the defendant's BAC was very high.  In addition, the jury could use their common sense to ascertain that, if the defendant's BAC was nearly three times higher than the legal limit to drive an automobile, he was likely to have been fairly severely intoxicated.[23]  In short, the judge's instruction was accurate and appropriate, and was therefore not given in error.

---

[23] We also note the possibility that the judge gave the instruction in response to defense counsel's actions in repeatedly referencing 0.08 per cent as the "legal limit" for intoxication.  At sidebar during Officer Levine's testimony, the judge informed defense counsel that she did not approve of a question asking whether Levine was aware that a person with a

e.  Closed court room.  The defendant finally argues that his right to a public trial was violated when his uncle was allegedly prevented from entering the court room during jury empanelment.  We agree with the judge that the issue was waived.

The uncle's exclusion, assuming it occurred, was not raised by the defendant at trial.  Nor was it raised in the defendant's first motion for new trial filed on November 16, 2009.  In his second motion for new trial filed on January 11, 2013 -- almost four years after he filed his first motion for new trial, and over seven years after his conviction, the defendant alleges that his right to a public trial under the Sixth Amendment to the United States Constitution was violated when his uncle was barred from the court room during the jury empanelment process.  In support of his argument, he proffered an affidavit from the uncle, in which he alleged that a court officer prevented him

---

0.08 per cent blood alcohol content is presumptively under the influence of liquor.  She stated, "there is no presumption of under the influence for any purpose other than driving.  This defendant wasn't driving a car, so I'm going to ask you to steer clear of that sort of thing."  She went on to say:  "It's a determination by the Legislature that a person shouldn't drive at a certain level.  It has nothing to do with any other purposes.  But, in any event, that's a legal matter, not a factual matter.  It's not a question to ask a witness about. So, I'm going to ask you to steer clear of that."  Given that defense counsel continued to broach the subject, the judge likely wished to ensure that the jury did not believe that the defendant was, as a matter of law, too intoxicated to form the intent for murder; an impression to which defense counsel contributed.

from entering the court room while the jury were being selected.[24]

The judge took no action on the defendant's second motion for new trial. She determined that the defendant waived his argument by failing to raise the issue in his original motion for new trial. He now appeals from what amounted to the denial of his motion for new trial.

The Sixth Amendment right to a public trial extends to the jury selection process. See Commonwealth v. Cohen (No. 1), 456 Mass. 94, 106 (2010) (citation omitted). It is well settled that the violation of a defendant's right to a public trial is structural error requiring reversal. See United States v. Marcus, 560 U.S. 258, 263 (2010) (citation omitted); Cohen (No. 1), supra at 105 (citation omitted). However, even structural error "is subject to the doctrine of waiver." Id. at 106, quoting Mains v. Commonwealth, 433 Mass. 30, 33 n.3 (2000). A defendant need not consent personally to the waiver of his right to a public trial; trial counsel may waive the right to a public trial as a tactical decision without the defendant's express consent. Lavoie, 464 Mass. at 88-89. Further, the right to a public trial may be procedurally waived whenever a litigant fails to make a timely objection to an error. Commonwealth v.

---

[24] The defendant also offered an affidavit from defense counsel averring that he was not aware of any closure and never discussed the issue with the defendant.

Morganti, 467 Mass. 96, 102 (2014). A procedural waiver may occur where the failure to object is inadvertent. See id. at 102 (holding public trial claim waived where counsel failed to object to court room closure during jury empanelment despite having no tactical reason); Commonwealth v. Alebord, 467 Mass. 106, 113, cert. denied, 134 S. Ct. 2830 (2014) (same).

Where defense counsel did not object to any alleged court room closure at trial, and the defendant failed to raise the claim in his first motion for new trial, we conclude the defendant's right to a public trial during jury empanelment has been waived. See Morganti, 467 Mass. at 102; Alebord, 467 Mass. at 113. See also Commonwealth v. Amirault, 424 Mass. 618, 641 (1997), quoting K.B. Smith, Criminal Practice and Procedure §§ 2070, 2084 (Supp. 1986) (doctrine of waiver applies equally to constitutional claims not properly raised on direct appeal or in prior motion for new trial). "To conclude otherwise would tear the fabric of our well-established waiver jurisprudence that 'a defendant must raise a claim of error at the first available opportunity.'" Morganti, supra at 102-103, quoting Commonwealth v. Randolph, 438 Mass. 290, 294 (2002).

Despite the fact that the claim is waived, we still analyze the defendant's claim pursuant to G. L. c. 278, § 33E, to determine whether a closure would subject him to a substantial likelihood of a miscarriage of justice. Contrary to the

defendant's assertion that the evidence is "clear and at this stage uncontested" that the court room was closed during jury empanelment, the record contains no such findings from the trial judge, and indeed the record is insufficient to determine whether a closure actually took place. However, we need not remand the case for further findings. Even if we were to assume that the court room was closed in the manner alleged by the uncle, the closure would not have caused the defendant to suffer a substantial likelihood of a miscarriage of justice because there is no "serious doubt whether the result of the trial might have been different" had the court room not been closed to the defendant's uncle. Randolph, 438 Mass. at 297, quoting Commonwealth v. Azar, 435 Mass. 675, 687 (2002), S.C., 444 Mass. 72 (2005). See Commonwealth v. Dyer, 460 Mass. 728, 736-737 (2011), cert. denied, 132 S. Ct. 2693 (2012); Commonwealth v. Horton, 434 Mass. 823, 833 (2001).

f. General Laws c. 278, § 33E. We have reviewed the record in accordance with G. L. c. 278, § 33E, to determine whether there is any basis to set aside or reduce the verdict of murder in the first degree, regardless of whether such grounds were raised on appeal. We find no such reason, and we decline to exercise our powers under the statute.

Judgment affirmed.