NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

10-P-666                                          Appeals Court


COMMONWEALTH  vs.  JASON STRICKLAND.


No. 10-P-666.

Hampden.     September 8, 2014. - January 23, 2015.

Present:  Berry, Kafker, & Maldonado, JJ.


Assault and Battery.  Assault and Battery by Means of a
     Dangerous Weapon.  Evidence, Medical record, Relevancy and
     materiality, Third-party culprit, Impeachment of
     credibility, Prior misconduct, Expert opinion.  Minor,
     Medical treatment.  Witness, Impeachment, Expert.
     Practice, Criminal, Assistance of counsel.  Dangerous
     Weapon.



Indictments found and returned in the Superior Court
Department on July 24, 2006.

The cases were tried before Judd J. Carhart, J., and a
motion for a new trial was considered by Bertha D. Josephson.


Michael J. Fellows & Myles D. Jacobson for the defendant.
Katherine E. McMahon, Assistant District Attorney, for the
Commonwealth.


KAFKER, J.  When eleven year old Haleigh Poutre arrived at

the hospital on September 11, 2005, she was unconscious and

barely breathing, her pale, emaciated body was covered in

bruises and huge burns, and the back of her head was swollen, lacerated, and bleeding.  Her horrible injuries had been inflicted in her own home, where she lived with her mother Holli Strickland[1] and stepfather, the defendant.  After a trial in Superior Court, a jury convicted the defendant of (1) wantonly or recklessly permitting, or wantonly or recklessly permitting another to commit an assault and battery causing, substantial bodily injury to Haleigh on or about September 10, 2005 (head injury); (2) wantonly or recklessly permitting, or wantonly or recklessly permitting another to commit an assault and battery causing, bodily injury to Haleigh on or before September 11, 2005 (multiple injuries of various ages);[2] (3) assault and battery by means of a dangerous weapon (bat); (4) assault and battery by means of a dangerous weapon (wand or stick or tube); and (5) assault and battery.  The jury acquitted the defendant of one count of assault and battery by means of a dangerous weapon (shod foot).

---

[1] After being released on bail, Holli Strickland was found dead along with her adoptive mother, as a result of an apparent murder-suicide.

[2] In each of the first two counts, the defendant was charged under both theories of G. L. c. 265, § 13J(b), namely, (1) assault and battery upon a child causing substantial bodily injury (count 1) or bodily injury (count 2), and (2) having care and custody of a child and wantonly or recklessly permitting, or wantonly or recklessly permitting another to commit an assault and battery causing, substantial bodily injury (count 1) or bodily injury (count 2).  The jury's verdicts rested only on the second theory.

On appeal from his convictions and from the denial of his new trial motion, the defendant argues that (1) the trial judge improperly excluded medical evidence from Haleigh's pediatrician and nurse with respect to the second, multiple injury count; (2) the wand that the defendant used to hit Haleigh was not a dangerous weapon; (3) the head injury conviction may have been based on a theory not supported in the evidence; (4) the motion for new trial should have been allowed where counsel was ineffective (a) for failing to impeach a witness, and (b) for failing to obtain an expert witness on a psychiatric condition known as Munchausen syndrome by proxy; and (5) an evidentiary hearing on the new trial motion was required. We affirm the convictions and the order denying the defendant's motion for a new trial.

Background. We recite the facts the jury could have found, reserving some facts for later discussion.

On Sunday, September 11, 2005, at about 2:45 P.M., eleven year old Haleigh was brought to the emergency room at Noble Hospital by her mother, Holli Strickland (Holli), and Holli's uncle, Brian Young. Haleigh was unconscious and unresponsive, her vital signs were very poor, and she was barely breathing. The back of her head was bleeding and so badly damaged that medical personnel described it as "boggy," i.e., swollen due to blood filling the scalp tissue. "Huge" burns were observed on

her chest, and her face was bloody, bruised, and "distorted." A "CT scan" of her brain was taken, as were photographs of her body.

Haleigh was transferred to the pediatric intensive care unit at Baystate Medical Center at about 5 P.M. that day. The admitting nurse testified that Haleigh's body core temperature was just eighty-one degrees, her pupils were "fixed," and she was "posturing" her limbs, signaling a traumatic brain injury. A second CT scan was performed at 7:30 P.M., and an "MRI" scan was completed the next morning. Haleigh's body was covered with other injuries of varying age from her head to her toes.

Dr. Richard Hicks reviewed Haleigh's scans, and opined at trial that Haleigh had suffered severe injuries to the brain, of the type "ordinarily . . . associated with high velocity motor vehicle accidents." Dr. Hicks explained that such injuries would have rendered Haleigh unconscious immediately and that based on the MRI and CT scans, he placed the brain injuries as having occurred at about 4 P.M. on Saturday, September 10, 2005, the day before Haleigh was first brought to the hospital. Dr. Hicks opined that a simple fall down the stairs would not have the force necessary to cause these injuries in a child.

Another trial expert, Dr. Christine Barron, corroborated Dr. Hicks's testimony, stating that for the injuries to Haleigh's brain to have resulted from a staircase fall, it

"would have to be a fall down the stairs with significant external forces, such as a [strong] push or a kick of the child at the top of the stairs." Dr. Barron estimated that Haleigh had sustained the severe head injuries some twelve to twenty-four hours before the Noble Hospital staff took the photographs. Dr. Barron also proffered her opinion as to the nature and manner of infliction of Haleigh's multiple other injuries.[3] She stated that the red bruises on the child's body were consistent with blunt force trauma, also inflicted twelve to twenty-four hours before the pictures were taken. Dr. Barron specifically identified two injuries that in her opinion could not be self-inflicted: a linear scar that ran from Haleigh's right ribcage, across her torso, and behind her hip; and a dry contact burn to her chest. Dr. Barron further testified that she could not give an opinion that any of the injuries were self-inflicted. Dr. Barron opined that the multiple injuries and scars occurred at different times, some having occurred within the twenty-four

---

[3] Dr. Barron's description of Haleigh's multiple other injuries covers almost one hundred pages of transcript. Dr. Barron identified multiple lacerations, linear abrasions, scars, and bruises on Haleigh's trunk and legs. Haleigh had cigarette burns on her left foot and left upper arm. Dr. Barron opined that the burns were not consistent with the appearance of accidental cigarette burns. Dr. Barron also identified "D"-shaped injuries, consistent with Haleigh having been struck with a hard, solid object. Haleigh also had a large, curvilinear "C"-shaped laceration and identically shaped bruising on her buttocks. Dr. Barron also testified that Haleigh had restraint injuries on her leg and left wrist.

hours preceding her hospitalization, while others were at least one week old; she could not date some injuries.

At the time of the injuries, Haleigh was living in the family home with her stepfather, who is the defendant; her aunt and adoptive mother, Holli; Haleigh's sister, who was nine years old in 2005; and Haleigh's brother, who was two years old in 2005. After being alerted to Haleigh's injuries, the police searched her home and noticed holes, indentations, and small brown blood stains on the walls of the stairway leading to the basement. Blood stains were also located on three walls of the basement playroom area, as well as in the first-floor bathroom. The blood stains on the walls of the basement stairway and in the bathroom were swabbed, tested, and determined to match Haleigh's blood.

In the master bedroom, a "Leatherman" tool with the brownish material on it and handcuffs were seized from the night table next to the bed. Tests on the Leatherman tool indicated a mixture of blood was present, to which Haleigh was a potential contributor. Handcuffs were also found in a "My Little Kitty" backpack in the family van, and a belt was recovered from the floor of the van. An aluminum bat with Haleigh's name on it was found in a basement closet. Work tools were strewn throughout the house.

At trial, Haleigh's sister was twelve. She testified that she had seen Holli and the defendant hit Haleigh with their hands, a belt, and a baseball bat, and that she saw scabs and bruises all over Haleigh, with whom she shared a bedroom. Haleigh's sister also recounted how Holli and the defendant would push Haleigh down the basement stairs to punish her and how the defendant began pushing Haleigh down the stairs shortly after he moved into the home, around 2002.

Haleigh's sister testified that after her soccer game on Saturday, September 10, 2005, she saw the defendant push Haleigh down the basement stairs and that this time Haleigh did not "wake up." Haleigh's sister heard the defendant order Haleigh to get up and then saw both Holli and the defendant shaking Haleigh to awaken her, but she remained on her back at the bottom of the stairs. Haleigh's sister saw the defendant carry Haleigh upstairs and place her in the bathtub in the first-floor bathroom.[4] Haleigh's sister added that a little later she saw the defendant carry Haleigh up to bed. Haleigh was not awake.

That evening Holli told a friend, a certified home health aide, that Haleigh was ill and that she had stayed home with Haleigh while the defendant went to the mall with Haleigh's

---

[4] This testimony was corroborated by forensic evidence indicating that blood found in and around the bathtub and on the walls of the basement stairway matched Haleigh's deoxyribonucleic acid (DNA) profile.

sister and brother. Holli declined the home health aide's offer to come over and take a look at Haleigh.[5] The next morning, Holli again spoke to her friend and told her that Haleigh was still sleeping and then called a pediatrician at about 10:30 A.M. The doctor on call who returned the message was not Haleigh's regular pediatrician. He testified that Holli reported that Haleigh had the stomach flu and had vomited twice; he offered to see Haleigh in one hour, but Holli declined the appointment.

The family had another soccer game to attend that afternoon, and because Haleigh was still "asleep," Holli asked Alicia Weiss, her neighbor and close friend, to watch Haleigh. Weiss arrived after noon, and the family left at about 12:30 P.M., leaving Weiss alone with Haleigh. Weiss testified that she checked on Haleigh three times. She saw some foam on Haleigh's mouth and testified that Haleigh neither moved nor woke up. The family returned at about 2:30 P.M., accompanied by Holli's uncle, Brian Young. At Holli's urging, Young checked on Haleigh and immediately realized something was very wrong; he carried her downstairs and brought her to Noble Hospital.

At trial, the Commonwealth introduced other eyewitness accounts of the defendant abusing Haleigh, including incidents

---

[5] The defendant testified that he came home at approximately 9 P.M. and saw Haleigh sleeping at approximately 10:30 P.M.

in which the defendant (1) struck Haleigh in the hand with a plastic tubular wand; (2) aided Holli in interrogating Haleigh as Holli beat her lower legs with a bat; (3) dragged Haleigh into the house by her ear, causing her to cry; (4) together with Holli took Haleigh into the bathroom, after which a muffled cry was heard and Haleigh emerged with a bloody lip; and (5) struck her in the head with his hand.[6]

The new trial motion judge (who was not the trial judge) accurately summarized the main elements of the defense at trial:

> "The defense called a treating health professional, . . . Pamela Krzyzek, who testified that when she came to the family's home, the defendant was not present because he was at work.[7] [Krzyzek testified that Haleigh told her she heard voices telling her to hurt herself and that she had hit her knees with a hammer.] She also testified that the defendant did not report Haleigh's injuries to her, but that it was always Holli who did. The defense also called Stephanie Trent Adams ('Adams'), whose children had attended Holli's daycare . . . . Adams testified that the defendant worked during the day . . . . Adams also recalled that she had seen Haleigh 'stair-surfing,' punching herself, and hitting her head against the wall of a cubby.
>
> "Defense counsel called two expert witnesses. Dr. Jonathan Arden testified that the kind of brain injury

---

[6] The primary sources of these other accounts of abuse were Weiss and Angela Harris, a friend of Haleigh's sister.

[7] Krzyzek was a clinical case coordinator working for an organization that provided voluntary assistance to families designed to stabilize a child's behavior transitioning from a hospital stay to home. In this case, Krzyzek received a referral to assist with Haleigh's transition to home after a stay at a hospital for an eating disorder. She saw Haleigh in the home approximately once per week from July, 2004, to September 7, 2005.

Haleigh suffered did not require the equivalent of a high speed car crash in order to cause it. [Arden gave an opinion that the head injury could have occurred between two or three hours and twenty-four hours before the 4 P.M. CT scan was taken on Sunday.] The other expert witness, Dr. Brian Wraxall, testified that he had examined the DNA taken from the Strickland home, and that [the defendant] was excluded as a potential source of that DNA.

"The defendant took the stand and denied any wrongdoing. He testified that he believed Holli when she told him that Haleigh was injuring herself and was receiving treatment for this condition. . . . Only Holli would take Haleigh to these appointments and would speak with the medical providers. The defendant learned of Haleigh's injuries through Holli."

The defense also attempted to discredit both Weiss and Haleigh's sister with prior inconsistent statements. For example, Haleigh's sister did not reveal that she had seen the defendant push Haleigh down the stairs on Saturday, September 10, until more than two years after the incident. In the interviews immediately after Haleigh was hospitalized, Haleigh's sister had claimed that she saw Haleigh hit her head on the floor in the basement while performing a back flip on Friday night and that as a result Haleigh briefly lost consciousness. For her part, Weiss initially told police that Holli was a good mother and volunteered that "[i]t's not like Holli would ever throw her kids down the stairs or, like, hit them," but Weiss testified at trial that she had "left out certain things" in an effort to "protect[] [her] best friend."

Discussion. 1. Excluded evidence. a. Exclusion of medical provider evidence as to the second count, involving multiple injuries that occurred on or before September 11, 2005.

On appeal, the defendant challenges the exclusion of testimony and records from Haleigh's pediatrician, Dr. Rukmini Kenia, and Dr. Kenia's nurse practitioner, Susan Malloy,[8] that the defendant claims established his defense to the count charging multiple injuries inflicted on or before September 11, 2005.[9] This argument is not directed at count one, the head injury, as Dr. Kenia and Malloy never treated Haleigh for the head injury, and the defense did not pursue a theory at trial that the head injury was the product of self-abuse. The records reflect that Haleigh was regularly seen in Dr. Kenia's office from at least 2001 until September 2, 2005, eight days before the injury to her head, and that she was sometimes treated by Dr. Kenia, but more often by Malloy.

The defense sought to introduce the testimony and records to establish that Dr. Kenia and Malloy saw Haleigh on numerous occasions, observed bruises and burns on her, and were treating

---

[8] Malloy had a master's degree in nursing, in addition to being a registered nurse and a certified pediatric nurse practitioner, and in accordance with G. L. c. 112, § 80B, she was licensed to make clinical decisions regarding care, the prescription of medications, therapeutics, and treatment.

[9] The medical records were marked for identification at trial and are part of the record appendix.

her for self-abuse.  Defense counsel wanted to conclude his questioning of Dr. Kenia and Malloy by asking, "on any occasion, did you consider the possibility that . . . any of her injuries were . . . caused by another?"  Defense counsel explained that he was "trying to corroborate [the defendant's] belief" that "[the defendant] had no reason to protect [Haleigh] because he thought it was self-abuse, so did the doctors, so did everybody else."  Defense counsel further explained that he sought to introduce the testimony regarding Malloy's determination regarding self-abuse, not for "the truth of the matter; [but because] it goes to [Malloy's] state of mind.  It is her determination which happens to corroborate the determination that [the defendant] testified to.  On that basis, I would like to offer that."[10]

---

[10] It is difficult to discern which particular visits and records were of interest to the defense.  On appeal the defense references various visits and records, most of which involve Malloy but not Dr. Kenia.  These include an April 12, 2004, record observing, "Pt. states she did hit face last pm intentionally because she was frustrated"; a June 18, 2004, record which reads, "pt admits to self-inflicting injury [with] spoons, forks [and] knives in her room"; a July 7, 2004, report where "pt states will write in book daily when feels frustrated instead of hurting self"; and a report from what appears to be November, 2004, involving "stair surfing" and a fall down cement steps.  The defendant also references in his brief an April 12, 2005, visit during which Holli reported that Haleigh had been limping since they returned from a hotel stay where Haleigh surfed on cement stairs.  At trial, several other visits with Malloy and Dr. Kenia were referenced.  These include a January 10, 2005, report where Haleigh "admit[ted] to hitting self [with] hammer"; an August 5, 2005, report reflecting a variety

The trial judge would not admit the medical provider evidence to corroborate the defendant's own beliefs.  The judge emphasized that the defendant never spoke to Dr. Kenia or Malloy.  The judge further concluded that the evidence was being offered for the impermissible purpose of corroborating Holli's and Haleigh's hearsay statements, as he determined "no one could tell" from the bruises alone whether a child had been hit by another, and the medical providers' testimony would necessarily be based on these statements.

A defendant in a criminal case has a constitutional right to present evidence, and that right extends to proof of facts that make a defendant's or another witness's testimony more credible.  See Commonwealth v. Emence, 47 Mass. App. Ct. 299, 301 (1999).  The admission of such corroborative evidence turns on its relevancy, and rests in the discretion of the trial judge.  See Commonwealth v. Galvin, 310 Mass. 733, 747 (1942) ("[A] trial judge may in his discretion allow a witness to testify to facts and circumstances corroborative of his testimony"); Commonwealth v. DeBrosky, 363 Mass. 718, 725 (1973) (hotel registration records admissible in judge's discretion to corroborate testimony of witness that group was registered in motel); Commonwealth v. Emence, 47 Mass. App. Ct. at 301-302

---

of bruises and wounds diagnosed as self-injury; and a similar July, 2005, report.

("The very existence of information that, as a matter of common sense and experience, supports the credibility of a witness prompts the conclusion that, so long as it is not remote, it ought to be admitted. . . . It is not necessary that the evidence in question bear directly on the issue or be conclusive of it").

The excluded evidence here involves the novel use of medical testimony and reports to buttress the defendant's credibility on the wanton or reckless mens rea element of the offense. The essential argument is that the excluded evidence from the medical providers would have corroborated the defendant's testimony (and therefore his defense) that he reasonably believed Holli when she told him that Haleigh's injuries resulted from self-abuse, and that he reasonably concluded that Haleigh was being appropriately treated by medical professionals, and that he therefore did not need to take additional actions to protect her. According to the defendant, the admission of the challenged testimony, namely, that the providers were indeed treating her injuries on numerous occasions and diagnosing them as self-inflicted and as not requiring further medical treatment or other action, would have corroborated the inferences the defendant drew to the same effect.

We conclude that this evidence was sufficiently relevant to the mens rea element of the offense and corroborative to be admissible in the judge's discretion.  See Commonwealth v. Emence, 47 Mass. App. Ct. at 301-302.  See also Commonwealth v. Twitchell, 416 Mass. 114, 126-130 (1993) (defendants were entitled to present affirmative defense grounded on belief that their conduct was not violation of law, based on reliance on Christian Science church publication on legal obligations of Christian Scientists, even if publication was later determined to be wrong, and publication should have been put before jury). "However, we need not decide whether the judge's ruling excluding the evidence amounted to an abuse of discretion because its exclusion did not prejudice the defendant's case." Commonwealth v. Smith, 460 Mass. 385, 398 (2011).  See Commonwealth v. Aguiar, 78 Mass. App. Ct. 193, 205-206 (2010) ("Under the prejudicial error standard, the reviewing court must be able to say with fair assurance that the error did not influence the jury, or had but very slight effect").

Most importantly, the multiple eyewitness accounts of the defendant's own brutality, and his knowledge and acceptance of Holli's brutality, overwhelmingly support the jury's determination that he was not merely a duped bystander.  For example, in addition to Haleigh's sister's testimony that she saw the defendant and Holli repeatedly push Haleigh down the

basement stairs, Weiss testified that the defendant was present when she saw Holli hit Haleigh in the lower leg with an aluminum bat with Haleigh's name on it.  Before Haleigh could answer, Holli struck her with the bat and Haleigh cried and fell to the floor.  Holli made her get back up, and the defendant and Holli repeated the interrogation and assault.  Holli explained to Weiss, while the defendant was still present, that she was using Haleigh's bat because it would look like Haleigh was hitting herself.  Weiss also recounted the defendant striking the back of Haleigh's hands with a "tubular wand" made out of plastic that was about two feet long.  Other brutal acts by the defendant were described by additional witnesses.

Important differences between the medical providers' and the defendant's access to Haleigh also detract from the excluded evidence's probative value.  Unlike the medical providers, the defendant lived in the home and saw Haleigh on a daily basis.  His observations, unlike theirs, were direct and contemporaneous, and not susceptible to distortion or obscuration by delayed reporting.  Trial evidence demonstrated that Holli kept significant control over the timing and circumstances in which Haleigh would be seen by her health providers.  The jury could infer that Holli took steps to mislead the physicians, but did not conceal her abuse in the home.  For example, Holli told Weiss, "If I kick an existing

bruise, there is no new evidence." Similarly Holli's calls to the home health provider and the pediatrician about Haleigh being asleep with the flu, when Haleigh had just suffered a traumatic head injury, and Holli's refusals of their offers to see Haleigh, seem calculated to mislead the medical providers. Additionally, the medical records are not devoid of suspicions of abuse. Notations in the medical records show at least two reports of suspected abuse were filed in January, 2005, and May, 2005, in accordance with G. L. c. 119, § 51A.

We also take into consideration the limited purpose for which the defendant offered the excluded evidence, namely, to merely corroborate his belief that Haleigh was being appropriately treated by her medical providers.[11] As such, the value of its admission was limited to bolstering that proposition, and it was not offered to establish its truth, a point counsel recognized. See Commonwealth v. DeBrosky, 363 Mass. at 725; Commonwealth v. Williams, 30 Mass. App. Ct. 543, 548 (1991) (not unreasonable for counsel to elicit otherwise inadmissible testimony of victim's state of mind where it could be used to corroborate defendant's insanity defense). Given this limited purpose, any prejudice that accrued from its exclusion was similarly minimized.

---

[11] Corroborative evidence is defined in Black's Law Dictionary 414 (4th ed. 1968) as "[e]vidence supplementary to that already given and tending to strengthen or confirm it."

Here the probative value of the medical providers' proposed testimony in terms of corroborating the defendant's own beliefs was particularly limited because the defendant never spoke to the medical providers despite Haleigh's numerous injuries, their severity and suspiciousness, and his superior knowledge of what was occurring in the home.  A jury would undoubtedly question why any parent would not speak to a doctor when his child was continually suffering such horrible injuries.  When the defendant's failure to speak to the medical providers in these circumstances is combined with multiple eyewitness accounts describing his own abuse of Haleigh and his presence when Holli abused Haleigh, any corroborative value of the medical providers is virtually extinguished.

In addition, the corroborative testimony was largely cumulative of other proof that informed the jury of incidents of self-abuse reported by Haleigh and treatment and monitoring of Haleigh for these injuries.  In particular Krzyzek, the clinical case coordinator, testified that she visited the home weekly during the year preceding the last incident and observed bruises on Haleigh and heard Haleigh's explanations for the injuries.[12] Krzyzek explained that she stayed in regular communication with

---

[12] Krzyzek testified that she saw bruises on Haleigh, but was told by Haleigh that she hit herself in the knees with a hammer, that her sister had "clocked" her in the face with a flashlight, and that she had hurt her throat choking on a "grinder."

"Holli, Haleigh, DSS,[13] the therapist, [and] Malloy", and that Malloy was assigned to do regular body checks on Haleigh. Defense counsel was also able to elicit from Dr. Barron that she had reviewed the medical records of Dr. Kenia and Malloy, and those records showed that Malloy regularly examined Haleigh, usually on a weekly basis, and that in July, 2005, Malloy observed bruises and abrasions that she characterized as "self-injury."[14]

In sum, we are convinced for all of these reasons that the exclusion of this limited evidence did not influence the jury, or had but very slight effect.

---

[13] The Department of Social Services, now known as the Department of Children and Families (DCF).

[14] Finally, even if the jury were inclined to credit some of the defendant's testimony regarding his lack of knowledge of, and participation in, the brutality, the evidence would have been inculpatory with respect to an alternate theory of guilt. To this point the focus has been on the objective measure of wanton or reckless conduct, but there is a subjective measure: "[i]f the grave danger was in fact realized by the defendant, his subsequent voluntary act or omission which caused the harm amounts to wanton or reckless conduct, no matter whether the ordinary man would have realized the gravity of the danger or not." Commonwealth v. Welansky, 316 Mass. 383, 398 (1944). See Commonwealth v. Pugh, 462 Mass. 482, 496-497 (2012). If the defendant truly believed Haleigh was engaging in self-injurious behavior, a belief he argues was bolstered by the excluded evidence, then leaving tools and other instruments all over the house with which Haleigh could harm herself was strong proof of wanton or reckless behavior. See Commonwealth v. Hendricks, 452 Mass. 97, 103-105 (2008) (engaging in high-speed nighttime car chase with police while three year old was in back seat constituted wanton or reckless behavior). As even Krzyzek testified, if she had seen tools out like a hammer or pliers, she would have considered them unsafe for Haleigh.

b.  Additional arguments against the exclusion of the medical provider evidence.  The defendant also raises several additional arguments regarding the medical provider evidence for the first time on appeal.  We review for a substantial risk of a miscarriage of justice.  See Commonwealth v. Ivy, 55 Mass. App. Ct. 851, 859 (2002).

The defendant contends that the opinion testimony should have been offered for its truth to prove what he calls a "third party culprit" theory because it shows that Haleigh, rather than the defendant, was responsible for her injuries.  This represents a significant shift from his position at trial where defense counsel emphasized that he was not offering the medical evidence for its truth, but rather to corroborate that the defendant, like the doctors, was "fooled" by Holli.  Blaming Haleigh for all of these horrible injuries was not a viable trial strategy, as trial counsel undoubtedly correctly understood and carefully avoided.  His defense was crafted to focus on the reasonableness of the defendant's beliefs and assumptions regarding the abuse, not whether Haleigh was actually inflicting all the injuries on herself.

Regardless, we consider this third-party culprit evidence irrelevant to count one, as neither Dr. Kenia nor Malloy treated Haleigh's head injury and therefore could offer no direct testimony on whether it was self-inflicted.  Moreover, the

thrust of the defense at trial to count one was never self-abuse but rather that the injury was inflicted by someone other than the defendant.  Thus, exclusion of the medical provider testimony on self-abuse certainly did not create a substantial risk of a miscarriage of justice on this count.

We also discern no such risk on count two, involving multiple injuries.  The record makes clear that many of the injuries observed on Haleigh's body were either not seen by the providers or not referenced in their records.  The omitted injuries included two wounds Barron specifically identified as not having been self-inflicted, namely, the injury consistent with being whipped by a wire and the multiple burns to Haleigh's chest that were about one week old.  Other omitted injuries included the curvilinear or "C"-shaped laceration and bruising on her buttocks consistent with blunt force trauma using a thin metal object; injuries consistent with blunt force trauma on multiple occasions using a hard object with a "D" shape (inferably, from whippings with a belt and buckle); and parallel linear restraint injuries on her leg and left hand.  The defendant provides no explanation of how the excluded evidence suggests that any of these injuries could reflect self-abuse. Finally, as explained above, there was ample evidence of self-

abuse before the jury, which the jury considered in their verdict.[15]

The defendant also claims that his inability to impeach Barron with the medical providers' diagnosis of self-abuse created a substantial risk of a miscarriage of justice.  We disagree.  Barron was confronted with at least one instance of the medical providers' diagnosis of self-abuse and acknowledged the diagnosis and discounted it.  Further exploration of Dr. Kenia's and Malloy's diagnosis of particular injuries with Barron would have opened the defense up to an expert attack on the competence of the medical providers' care of Haleigh.  See Commonwealth v. Wall, 469 Mass. 652, 663-665 (2014) (failure to impeach witness is generally not reversible error).

Finally, the defendant argues that Holli's and Haleigh's statements were admissible because they were made for the "purpose of medical diagnosis or treatment."  Bouchie v. Murray, 376 Mass. 524, 529 (1978).  See Commonwealth v. Irene, 462 Mass. 600, 611-615, cert. denied, 133 S. Ct. 487 (2012) (discussing standards for admitting medical records and opinions).  See also Commonwealth v. Arana, 453 Mass. 214, 231 (2009).  Even if we

---

[15] Finally, evidence of Haleigh's self-abuse, and the defendant's knowledge of it, would be inculpatory on the alternative theory that he was wanton or reckless in leaving tools around the house; thus, as discussed above, its exclusion could not create a substantial risk of a miscarriage of justice on this ground as well.

were to assume, without deciding, that some of Holli's or Haleigh's statements may have been admissible for this purpose, we discern no substantial risk of a miscarriage of justice for the reasons discussed above and because they were cumulative of testimony given by Krzyzek, the defendant, and others.

c.  Exclusion of Holli's statement to Weiss as alternative third-party culprit.  The defendant argues for the first time on appeal that he should have been permitted to elicit from Weiss that Holli told Weiss that Haleigh's misbehavior was so severe that Holli had to use extreme measures to discipline her.  The defendant asserts this evidence was probative of Weiss's motive and intent to push Haleigh down the stairs when Weiss was alone with her on the morning of Sunday, September 11.  At trial, however, the defendant sought to admit this statement on the ground that it was relevant to show Holli's and the defendant's states of mind and to show Weiss's bias.  Because the issue has not been preserved, we review the error, if any, to determine if it created a substantial risk of a miscarriage of justice.  See Commonwealth v. Rivera, 425 Mass. 633, 636-637 (1997).

There is no such risk where evidence supporting Weiss's testimony that Haleigh never woke up while she was with her on September 11, was overwhelming, to say nothing of the virtually nonexistent possibility that Haleigh rose from her "sick" bed and engaged in behavior that was so "severe" that she had to be

kicked or pushed down the stairs to be controlled. Even the defendant testified that Haleigh began to feel ill on Saturday, September 10, and that he did not see her walking around at any time after he left for the mall on Saturday night.

d. Exclusion of Weiss's prior bad acts. The defendant proffered testimony from a witness who was in Weiss's daycare in 2004. He would testify that Weiss would duct tape a "binky" in his mouth and tell him that "if he was going to act like a baby, she would treat him like a baby." She would also "tie [his older brother] in a chair and lead [the chair] across the room." According to the defendant the evidence was probative of Weiss's motive and intent to injure Haleigh, as part of a third-party culprit defense. We agree with the Commonwealth that the judge did not abuse his substantial discretion in excluding these incidents where they involved different children and were markedly different in terms of the degree of force employed. See Commonwealth v. Hunter, 426 Mass. 715, 716-717 (1998); Commonwealth v. Bregoli, 431 Mass. 265, 274 (2000).

2. Wand as a dangerous weapon. There is no merit to the defendant's contention that the evidence was insufficient to establish that the plastic tube or wand the defendant used to strike Haleigh's hands was dangerous. "The essential question, when[, as here,] an object which is not dangerous per se is alleged to be a dangerous weapon, is whether the object, as used

by the defendant, is capable of producing serious bodily harm." Commonwealth v. Marrero, 19 Mass. App. Ct. 921, 922 (1984). The evidence that the two-foot-long wand was used to repeatedly strike Haleigh on the back of the hands and caused her to scream and cry so loudly that Weiss, on another floor of the house, heard her and came to her aid was sufficient to permit the jury to conclude that it was being used in a manner capable of producing serious bodily injury. See, e.g., Commonwealth v. Appleby, 380 Mass. 296, 303-305 (1980) (riding crop); Commonwealth v. Cruz, 430 Mass. 182, 194-195 (1999) (duct tape); Commonwealth v. Barrett, 12 Mass. App. Ct. 1001, 1002 (1981) (aerosol spray can); Commonwealth v. Rossi, 19 Mass. App. Ct. 257, 261 (1985) (large ring worn on hand); Commonwealth v. Marrero, 19 Mass. App. Ct. at 922-923 (boots); Commonwealth v. McIntosh, 56 Mass. App. Ct. 827, 830-831 (2002) (windowpane).

3. <u>Sufficiency of the evidence to sustain the conviction related to the brain injury</u>. On appeal, the defendant makes a somewhat confusing argument that the evidence was insufficient to support his conviction on count one. We discern no merit to this argument. The trial evidence sufficiently establishes the defendant's wanton or reckless conduct. Haleigh's sister had seen both the defendant and Holli kick Haleigh down the basement stairs on numerous occasions and described the defendant as pushing Haleigh down the stairs on September 10. Weiss also

observed Holli beat Haleigh, with the defendant sometimes participating and other times observing without objection. Thus, the evidence demonstrated that he was participating in the abuse of Haleigh, including pushing her down the stairs, or was knowledgeable that it was occurring and was permitting it to happen. See Commonwealth v. Torres, 442 Mass. 554, 568 (2004), quoting from G. L. c. 265, § 13J(b) ("Whatever forms of conduct might come within the term permit[ting]" another to commit assault and battery, encouraging such batteries by hitting the children himself, and then turning them over to Fappiano for further abuse, would surely come within the concept of 'permit[ting]' such a battery").[16] Given the extent of this abuse of Haleigh by both the defendant and Holli, including their punishing of Haleigh by pushing her down the stairs, the jury were warranted in finding the defendant wanton or reckless even if he was not present and it was Holli who threw Haleigh down the stairs when the brain injuries occurred. See Commonwealth v. Welansky, 316 Mass. 383, 387 (1944) (defendant nightclub owner not present on night of fatal fire); Commonwealth v. Pugh, 462 Mass. 482, 496-497 (2012); Commonwealth v. Robinson, 74 Mass. App. Ct. 758-759 (2009). Moreover, his conduct after the injury was wanton or reckless,

---

[16] In any event, there was ample evidence to refute the notion posited by the defendant on appeal that Haleigh alone caused her head injury.

as "a reasonable person, knowing what the defendant knew, would have realized that there was a high likelihood that [the child] would suffer a substantial bodily injury if she did not receive timely medical attention." Id. at 758.

4. Motion for new trial. The defendant presses three claims on appeal that he argued in his motion for new trial: counsel's failure to utilize certain impeachment evidence at trial, the failure of trial counsel to obtain an expert, and the judge's denial of an evidentiary hearing on the new trial motion. We discern no merit to the arguments.

A judge's decision to deny a motion for a new trial "will not be disturbed unless a review of the defendant's case shows that the decision, if not reversed, will result in 'manifest injustice.'" Commonwealth v. Vazquez, 69 Mass. App. Ct. 622, 631 (2007), quoting from Commonwealth v. Delong, 60 Mass. App. Ct. 122, 127 (2003). "[T]he decision whether to decide the motion on the basis of affidavits or to hear oral testimony, is left largely to the sound discretion of the judge." Commonwealth v. Stewart, 383 Mass. 253, 257-258 (1981). See Commonwealth v. Grace, 397 Mass. 303, 312-313 (1986).

a. Impeachment evidence. Contrary to the defendant's contention, counsel's failure to impeach Weiss with ambiguous evidence -- the omission from her prior written statement to police dated September 19, 2005, that the defendant was present

when she saw Holli beating Haleigh with the bat on one particular occasion -- did not deprive him of an "otherwise available, substantial ground of defence." Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). See Commonwealth v. Wall, 469 Mass. at 663-665 (generally failure to impeach a witness does not constitute ineffective assistance of counsel). As previously explained, defense counsel effectively cross-examined Weiss on her change in testimony, her failure to intervene to prevent the abuse, and the circumstances in which she eventually implicated the defendant and Holli.

b. Failure of counsel to obtain an expert on Munchausen syndrome by proxy (MSBP). The defendant claims that his attorney was ineffective for failing to obtain an expert to testify that Holli was suffering from MSBP. In support of this claim, the defendant attached two affidavits and reports from Dr. Robert Chabon, and Beth Wechsler, a licensed social worker, to his motion for new trial. Each expert had prepared the materials in April, 2011, on behalf of Pamela Krzyzek and her employer, Brightside, Inc., to defend a civil lawsuit brought by Haleigh's legal guardian. Wechsler described MSBP as a condition involving caregivers who cause injury to someone else, often a child, in order to be viewed as "a loving rescuer of a child who has severe problems." Dr. Chabon explained that the "family constellation typically includes fathers who are 'away

at work' a great deal and are completely oblivious and are uninvolved in the process that involves numerous office visits and hospitalizations of their own children." According to Dr. Chabon, "[n]early all individuals who come into contact with [MSBP] cases experience some resistance to believing that mothers could intentionally harm their children in this horrifying way. The disbelief is in part engendered by a dramatic discrepancy between the public presentation and the private reality of these families" (emphasis supplied). See Commonwealth v. Robinson, 30 Mass. App. Ct. 62, 74 n.10 (1991), citing People v. Phillips, 122 Cal. App. 3d 69, 76-77, 78-79, 85 n.1 (1981), for a description of MSBP.

Both Dr. Chabon and Wechsler gave an opinion that Holli presented a case of MSBP and that in the circumstances neither Krzyzek nor her employer reasonably could have been expected to determine that Haleigh was the victim of child abuse.

Because the proffered evidence was prepared in relation to defending a social worker, the materials failed to address the issue at bar, namely, whether the defendant was among those reasonably misled. The reports discuss Holli's deception that was directed solely toward her medical providers and, as Dr. Chabon notes, "dramatic" discrepancies occur between the public presentation (medical office visits) and the family home. That information concerning the defendant's role was not considered

by Wechsler or Dr. Chabon is clear from the detailed list of sources they reviewed, which omits the transcript from the trial and interviews with Weiss, Haleigh's sister, and any other witnesses who saw the defendant abuse Haleigh.

Absent evidence that Holli's deception extended beyond her public presentation to the professionals working with Haleigh, the defendant has failed to demonstrate that MSBP would have been relevant in assessing his role in the abuse.  The motion judge similarly concluded that the evidence "would not have exculpated [him] as it does not directly contradict the eyewitness testimony that the defendant was present and partook in the violent acts against Haleigh."  In these circumstances, the defendant has not shown that counsel's behavior fell below that of an ordinary fallible lawyer and likely deprived him of an otherwise available, substantial ground of defense.  See Commonwealth v. Saferian, 366 Mass. at 96.

c.  Hearing on motion for new trial.  The defendant argues that he should have been granted a hearing on his motion for new trial because the evidence regarding MSBP was newly discovered. According to the defendant, the experts' proffered opinions in the materials attached to his motion were dependent on discovery from the related civil trial, materials which were not released until after he had been convicted.  As the motion judge found, "the defendant's attorneys could have uncovered any link to MSBP

through the information provided by Haleigh's medical providers, [DSS], and law enforcement investigators,"[17] particularly because MSBP, also known as factitious disorder by proxy, had been identified as a disorder well in advance of the defendant's trial.  See Commonwealth v. Robinson, supra; American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 781-783 (4th ed. text revision 2000).  Also, trial defense counsel had informed appellate counsel that he had considered MSBP at the time of trial and concluded it was not relevant.  Thus, the evidence related to MSBP was not newly discovered.  See Commonwealth v. LeFave, 430 Mass. 169, 176 (1999).

Judgments affirmed.

Order denying motion for new
trial affirmed.

---

[17] The DSS workers whose depositions were reviewed by Dr. Chabon and Wechsler were on the defendant's witness lists.