NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

23-P-240                                          Appeals Court

COMMONWEALTH  vs.  DAVID K. NJUGUNA.

No. 23-P-240.

Worcester.     September 13, 2023. – May 2, 2024.

Present:  Rubin, Neyman, & Walsh, JJ.

Homicide.  Motor Vehicle, Homicide, Operating to endanger.
     Wanton or Reckless Conduct.  Practice, Criminal,
     Duplicative convictions, Lesser included offense, Required
     finding, New trial, Assistance of counsel.  Constitutional
     Law, Assistance of counsel.  Due Process of Law, Assistance
     of counsel.  Witness, Impeachment.

     Indictments found and returned in the Superior Court
Department on May 18, 2016.

     The case was heard by Janet Kenton-Walker, J., and a motion
for new trial was heard by her.

     Andrew P. Power for the defendant.
     Donna-Marie Haran, Assistant District Attorney, for the
Commonwealth.

     NEYMAN, J.  Following a jury-waived trial in the Superior

Court, the defendant, David K. Njuguna, was convicted of

involuntary manslaughter, G. L. c. 265, § 13, motor vehicle

homicide by negligent or reckless operation ("motor vehicle homicide"), G. L. c. 90, § 24G (b),[1] reckless or negligent operation of a motor vehicle so as to endanger the lives or safety of the public ("operating to endanger"), G. L. c. 90, § 24 (2) (a), and operating an uninsured motor vehicle, G. L. c. 90, § 34J.[2]  On appeal he argues that the evidence at trial was insufficient to sustain convictions for involuntary manslaughter, motor vehicle homicide, and operating to endanger, and that his trial attorney rendered ineffective assistance of counsel.  These claims are unpersuasive.  However, the defendant also contends that the convictions for manslaughter and motor vehicle homicide are duplicative and thus only the most serious crime of manslaughter may stand.[3]  Although motor vehicle homicide is not a lesser included crime of manslaughter under the traditional elements-based test, see Commonwealth v. Vick, 454 Mass. 418, 431 (2009), and Morey v. Commonwealth, 108 Mass. 433, 434 (1871), in this specific context, Supreme Judicial

---

[1] In 2018, two years after the conduct at issue in the present case, the Legislature amended the motor vehicle homicide statute, G. L. c. 90, § 24G.  None of the amendments impact the issues raised on appeal.

[2] The judge found the defendant not guilty of (1) operating a motor vehicle under the influence of drugs and causing the death of another person, and (2) felony motor vehicle homicide.

[3] The defendant likewise argues that the operating to endanger conviction is duplicative of the involuntary manslaughter conviction.

Court precedent construing the motor vehicle homicide statute holds that because the Legislature did not intend to impose multiple punishments for manslaughter and motor vehicle homicide, punishments under the two statutes may not be imposed for the same act. See Commonwealth v. Jones, 382 Mass. 387, 394 (1981). Consequently, we reverse the judgments of conviction of the lesser offenses of motor vehicle homicide and operating to endanger. We otherwise affirm the judgments of conviction of manslaughter and operating an uninsured motor vehicle.

Background. Because the defendant challenges the sufficiency of the evidence, we summarize the evidence in the light most favorable to the Commonwealth, reserving certain details for discussion. See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).

On the morning of March 16, 2016, the defendant drove his 2011 black Nissan Maxima to a marijuana dispensary in Brookline. There, shortly before 11 A.M., he purchased four pre-rolled marijuana cigarettes. He returned to the Nissan and subsequently drove onto the Massachusetts Turnpike (route 90) at the "Weston tolls" at approximately 11:19 A.M.[4]

---

[4] Evidence regarding the locations of the defendant's vehicle stemmed from multiple sources including eyewitness testimony, the defendant's cellular telephone records, corresponding cell site location information, and data from "E-ZPass," the "electronic highway toll collection system." Commonwealth v. Fitzpatrick, 463 Mass. 581, 585 n.7 (2021).

That same morning, a Honda Ridgeline truck was traveling westbound on route 90 at approximately seventy to seventy-five miles per hour. The driver, Steven Janko, saw a black or very dark blue sedan "coming up pretty quickly," changing lanes to pass a tractor-trailer, again changing lanes "quickly across all the lanes," and then speeding past the Ridgeline. Janko described the operator of the sedan as having "[d]ark hair, dark skin." Janko commented to the two other occupants of the Ridgeline, "I don't think I've ever seen anybody driving this poorly." One of those occupants, Richard Brattlof, likewise observed the black sedan, which he observed to be a Nissan, "coming up really fast" and "moving at a high rate of speed." He, too, described the driver as having "dark-colored skin," and having "about shoulder length curlyish hair." Brattlof observed the sedan pass the right side of the Ridgeline at a high rate of speed and then "went back across two lanes to the far left-hand lane" without using any turn signals.

Approximately one to two minutes later, Janko pulled into the rest area in Charlton. Just after 12:04 P.M., as the occupants of the Ridgeline returned to the vehicle, they "noticed that the traffic on the Pike had come to a stop." They sat in traffic for a long time and eventually passed a crash scene, at which point Brattlof observed a "state [police] cruiser, SUV" in a field off the side of the road, and a "black

Nissan with the whole front end torn up from the accident, facing the wrong way on the right side of the road."  Brattlof stated that the black Nissan looked "similar" to the car that had passed the Ridgeline at a high rate of speed earlier.

Several witnesses presented eyewitness testimony regarding the crash itself.  Christopher Lindsay, who was driving his Ford Explorer westbound in the middle lane of route 90 at approximately seventy-five miles per hour sometime before noon, witnessed a black "Maxima or Altima" that "was going really fast," and passed him on the left.  The black car drove two to three lengths ahead of Lindsay's Explorer, moved to the middle lane without using a turn signal, moved to the right lane, and "went right into the breakdown lane, and instantly straight into the back of [a police] cruiser, the back corner of it."[5]  Lindsay pulled his Explorer to the side of the road and ran to the police cruiser, which was in a ditch.

Around noon another witness, Thomas Sorrentino, was also driving westbound on route 90 at approximately seventy-five miles per hour when he observed a "black Maxima" in front of him "going from the left lane, and it darted over all the way to the right lane" without braking or using any turn signals.  Ahead, Sorrentino noticed a State trooper in an unmarked vehicle, with

---

[5] After impact, the police cruiser struck a Chevrolet Tahoe that had been parked in front of the cruiser prior to the crash.

its lights activated, and a car in front of the cruiser.  He saw the black Maxima "cut over to the right lane pretty quickly, on like an angle," at which time "[i]t seemed like [it] would go off the road," but the vehicle "[p]retty much corrected itself and stayed straight on the shoulder, and it rode the shoulder." The black Maxima "kept continuing straight towards where the state trooper was," and "collided into the back of the state trooper's vehicle."[6]

At approximately noon that same day, Elizabeth Roche, a registered nurse, was traveling with her daughter westbound on route 90 and saw "an SUV-like vehicle on the grassy side, pushed off more than the breakdown lane, completely off the highway." She and her daughter got out of the car, approached the vehicle, and saw that the cruiser was damaged to the extent that it "was not identifiable as a police car."  They also saw that there was an occupant in the driver's side of the vehicle, Trooper Thomas Clardy, who was unresponsive.  Roche did not feel a pulse and performed cardiopulmonary resuscitation (CPR) on Trooper Clardy

---

[6] The Commonwealth also presented considerable evidence corroborating the eyewitness testimony.  This included physical evidence documented and retrieved from the scene and from the defendant's and victim's vehicles, photographic evidence, and extensive testimony and evidence from accident reconstruction experts.  The accident reconstruction evidence included testimony that there were no "pre-impact marks" at the crash site, and opinion testimony that the Nissan driven by the defendant was traveling at a minimum speed of eighty-one miles per hour at impact.

until additional State police troopers and emergency personnel arrived.  Efforts to save Trooper Clardy's life were not successful.  He sustained fatal injuries, and the cause of death was determined to be blunt force trauma to the head, neck, and torso.

The defense at trial centered on the claim that the defendant suffered a seizure or other medical event that caused the crash.  The judge credited the portion of the defendant's expert witness's testimony that the defendant "may have suffered a convulsive episode," but rejected his opinion that the episode occurred prior to the crash.  The judge further found that the Commonwealth presented "reliable evidence as the level of both active and inactive THC in the defendant's blood approximately an hour after the event," but found that without expert testimony the Commonwealth did not prove beyond a reasonable doubt that the defendant's ability to drive was impaired by marijuana.  Accordingly, the judge acquitted the defendant of the two counts -- operating a motor vehicle under the influence of drugs and causing the death of another person and felony motor vehicle homicide -- that required proof of intoxication.

Discussion.  1.  Relationship between involuntary manslaughter and motor vehicle homicide.  The defendant argues that the crime of motor vehicle homicide is merely a lesser form of involuntary manslaughter by reckless driving and thus the

conviction on the less serious offense -- here motor vehicle homicide -- must be vacated. The Commonwealth responds that because motor vehicle homicide and involuntary manslaughter each require proof of an element absent from the other, the former is not a lesser included offense of the latter, and, accordingly, the crimes are not duplicative, and the defendant's claim fails.

Our analysis begins with Jones, 382 Mass. at 394. There, the Supreme Judicial Court considered whether motor vehicle homicide is a lesser included crime of involuntary manslaughter. Citing Morey, 108 Mass. at 434, the court noted that "[i]n determining whether, on the basis of a single act, a defendant may be prosecuted and punished for two statutory or common law crimes, the long-prevailing test in this Commonwealth is whether each crime requires proof of an additional fact that the other does not" (emphasis added). Jones, 382 Mass. at 393. Applying this traditional "elements-based" test, the court concluded that "each offense plainly requires proof of an additional fact that the other does not." Id. To convict a defendant of vehicular homicide, the defendant must have operated "a motor vehicle upon a way or in a place to which members of the public have access" whereas "a conviction of manslaughter requires neither the use of a motor vehicle nor any element of public access." Id. A conviction of involuntary manslaughter requires that "the Commonwealth must prove wanton or reckless conduct; to convict

of vehicular homicide, no such proof is necessary." Id. The court thus concluded that vehicular homicide is not "a lesser-included crime of manslaughter." Id. at 394.

Although the court in Jones declined to hold that motor vehicle homicide is a lesser included offense of manslaughter, it nonetheless concluded as follows:

> "in the present situation, which in fact did involve operation of a motor vehicle on a public way, the two offenses are sufficiently closely related so as to preclude punishment on both. . . . If involuntary manslaughter by reckless driving in public is proved, homicide by negligently operating to endanger is proved as well. The former is merely an aggravated form of the latter."

Id. The court further stated that the legislative history of the motor vehicle homicide law, G. L. c. 90, § 24G, indicates that "the purpose of [that law], was to provide a middle ground between the felony of manslaughter and the misdemeanor of driving so as to endanger," and no support exists for the notion that, "by enacting the [motor vehicle] homicide statute as a middle ground between operating to endanger and manslaughter, the Legislature intended to punish a defendant for the two less serious motor vehicle offenses if he is already being punished under the most serious offense of manslaughter." Id. at 390-391, 394. In view of the legislative purpose of the statute,

the court held that "multiple punishments should be disallowed," and vacated the less serious offense of motor vehicle homicide.[7]

Although Jones relied on an analysis of legislative intent, not the similarity of the conduct at issue, it did at one point state that "the two offenses are sufficiently closely related so as to preclude punishment on both," language redolent of the conduct-based test that was sometimes used to determine whether convictions are duplicative. See, e.g., Commonwealth v. Santos, 440 Mass. 281, 292-294 (2003), overruled on other grounds by Commonwealth v. Anderson, 461 Mass. 616, 633-634, cert. denied, 568 U.S. 946 (2012). But see Commonwealth v. Arriaga, 44 Mass. App. Ct. 382, 387 (1998). Massachusetts appellate courts have subsequently issued numerous decisions not only applying the elements-based approach to determine whether multiple convictions stemming from one criminal transaction are duplicative, but also explaining that the conduct-based approach is inapt. See Vick, 454 Mass. at 436 ("It bears repeating that where, as here, neither crime is a lesser included offense of the other, multiple punishments are permitted even where the offenses arise from the very same criminal event").[8]

---

[7] In Jones, the court likewise vacated a conviction of operating to endanger, G. L. c. 90, § 24 (2) (a), on the same basis. Jones, 382 Mass. at 396-397.

[8] In Vick, the court reiterated that the traditional elements-based test embodied in Morey and its progeny "remains

Seizing on this line of cases, the Commonwealth insists that <u>Jones</u> is a vestige of the conduct-based test and no longer controls the outcome in the present case. We agree that the conduct-based approach has been rejected and note that it does not appear that <u>Jones</u> was intended to support the application of the conduct-based test. However, we disagree that <u>Jones</u> is not controlling precedent in the context presented here. In <u>Commonwealth</u> v. <u>Suero</u>, 465 Mass. 215 (2013), the most recent Supreme Judicial Court case to note <u>Jones</u>'s construction of the motor vehicle homicide statute, the court reiterated that the "Legislature did not intend 'to punish a defendant for the two less serious motor vehicle offenses [motor vehicle homicide and

---

the standard for determining whether multiple convictions stemming from one criminal transaction are duplicative." <u>Vick</u>, 454 Mass. at 431. See <u>Commonwealth</u> v. <u>Jones</u>, 441 Mass. 73, 76 (2004) (under <u>Morey</u> test "[t]he actual criminal acts alleged are wholly irrelevant to application of [the rule]; rather, the elements of the crimes charged are considered objectively, abstracted from the facts" [citation omitted]); <u>Commonwealth</u> v. <u>Crocker</u>, 384 Mass. 353, 360 (1981) ("In order to determine whether the Legislature in a given situation has authorized conviction and sentence under two statutory offenses, the <u>Morey</u> test provides a fitting rule of interpretation"); <u>Commonwealth</u> v. <u>Buckley</u>, 76 Mass. App. Ct. 123, 126 (2010), abrogated on other grounds by <u>Commonwealth</u> v. <u>Negron</u>, 462 Mass. 102, 105 (2012) ("the siren song of the conduct-based approach has been silenced"); <u>Commonwealth</u> v. <u>Gallant</u>, 65 Mass. App. Ct. 409, 414-415 (2006) ("it is difficult to see how such a conduct-based test could ever possibly mesh with the <u>Morey</u> standard"); <u>Commonwealth</u> v. <u>Arriaga</u>, 44 Mass. App. Ct. 382, 388 (1998) (conduct-based analysis, "to the extent that it has been incorporated into Massachusetts common law rule, applies only to instances of successive prosecution, not multiple charges tried in a single proceeding").

operating to endanger] if [the defendant] is already being punished under the most serious offense of manslaughter.'" Suero, 465 Mass. at 221, quoting Jones, 382 Mass. at 394. Thus, the Commonwealth's argument is not persuasive.

To be clear, we recognize that Jones itself is limited to the manslaughter, motor vehicle homicide, and operating to endanger statutes. See Jones, 382 Mass. at 390-391 (from legislative history underlying motor vehicle homicide statute, it is "clear that the purpose [of the statute], was to provide a middle ground between the felony of manslaughter and the misdemeanor of driving so as to endanger"). Nonetheless, Jones remains the law of this Commonwealth and it is controlling here. See Jones, 382 Mass. at 394. Therefore, the conviction of the lesser offense of motor vehicle homicide must be reversed. For the same reasons, the judgment of conviction of the lesser offense of operating to endanger must also be reversed. See id. at 394-395 (vacating judgments of conviction of less serious offenses of motor vehicle homicide and operating to endanger).

2. Sufficiency of the evidence. The defendant next argues that there was no evidence that he voluntarily drove his car in the seconds preceding the crash, and thus the Commonwealth failed to prove the element of "operating a motor vehicle." Accordingly, he contends, the convictions of motor vehicle homicide and operating to endanger cannot stand.

We apply the familiar Latimore test to determine "whether, after viewing the evidence in the light most favorable to the [Commonwealth], any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis and citation omitted). Latimore, 378 Mass. at 677. "If, from the evidence, conflicting inferences are possible, it is for the [factfinder] to determine where the truth lies, for the weight and credibility of the evidence is wholly within [its] province." Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011). See Commonwealth v. Nelson, 370 Mass. 192, 203 (1976) (evidence "need not require the jury to draw the inference"; "sufficient that the evidence permitted the inference" to be drawn). See also E.B. Cypher, Criminal Practice and Procedure § 37.10 (4th ed. 2014).

An individual "operates" a motor vehicle when, in the vehicle, that individual "intentionally does any act or makes use of any mechanical or electrical agency of the vehicle which, alone or in sequence, will set the vehicle in motion or driv[e] the vehicle under the power of the motor machinery" (citations and quotations omitted). Commonwealth v. Merry, 453 Mass. 653, 661 (2009). Here, it was undisputed that the defendant drove the black Nissan that struck and killed the victim. Nevertheless, the defendant claims that he suffered a seizure

prior to the crash, and thus without evidence of braking, negotiating a curve in the road, or other evidence of a voluntary act, the proof of operation was deficient. The claim is unpersuasive for various reasons.

First, the premise of the defendant's argument is incorrect and unsupported by legal authority. The alleged absence of evidence of braking or maneuvering the black Nissan prior to the crash does not, standing alone, mandate a finding that the defendant did not act voluntarily. It is obvious that individuals still operate a motor vehicle when they intentionally continue to "driv[e] the vehicle under the power of the motor machinery" without braking or maneuvering (citation omitted). See Merry, supra. Second, contrary to the defendant's claim, multiple eyewitnesses observed the defendant drive at very high speed, tailgate at excessive speed, weave in and out of lanes, pass other vehicles in a dangerous manner, cross myriad lanes of traffic without using turn signals or applying brakes, drive into the breakdown lane at excessive speed, and drive his vehicle into the victim's cruiser. One eyewitness testified that the black Nissan cut across the lanes of route 90 and then "[p]retty much corrected itself and stayed straight on the shoulder" prior to striking the cruiser. Another eyewitness similarly testified that, after moving across route 90, the black Nissan drove straight into the cruiser. The

evidence that the defendant straightened his vehicle after moving into the breakdown lane contradicts the claim that there was no evidence that he committed any voluntary act immediately before the crash. Third, this eyewitness testimony was corroborated by the State police expert witness's testimony that "maximum engagement marks" at the crash scene "are running parallel . . . with the breakdown lane," which "indicates the direction . . . the Nissan was traveling at impact." The diverging opinion of the defendant's expert witness does not alter the result. "That contradictory evidence exists is not a sufficient basis for granting a motion for a required finding of not guilty." Merry, 453 Mass. at 661.

Finally, the judge was free, but not required, to believe the defense expert's testimony that the defendant had suffered a "convulsive episode" such as a seizure or syncope prior to the accident. See Commonwealth v. Urrea, 443 Mass. 530, 546-547 (2005) (jury not required to believe testimony of expert over testimony of lay witness). This is particularly so in view of the above-described evidence regarding the straightening of the black Nissan immediately prior to the crash, as well as the countervailing expert testimony proffered by the Commonwealth. Specifically, another Commonwealth expert witness testified that prior to the crash the defendant had never reported having a seizure or losing consciousness; that prior to the crash there

was no evidence in any of the defendant's medical records or elsewhere regarding any history of seizures or loss of consciousness; and that it was only after the incident occurred that the defendant mentioned that he had purportedly experienced "episodes of loss of consciousness in the past." The judge was free, in these circumstances, to reject the defendant's new reports of a history of medical episodes and reject the defense expert's opinion that the defendant suffered a seizure immediately prior to the crash. See Merry, 453 Mass. at 663.

The defendant also contends that the conviction for involuntary manslaughter cannot stand because the Commonwealth failed to prove that wanton or reckless conduct caused the collision. The argument is unpersuasive.

A conviction for involuntary manslaughter requires proof that a defendant: (1) "caused the victim's death," (2) "intended the conduct that caused the victim's death," and (3) acted in a manner that was wanton or reckless. Commonwealth v. Guaman, 90 Mass. App. Ct. 36, 40 (2016). Wanton or reckless conduct is "intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." Commonwealth v. Welansky, 316 Mass. 383, 399 (1944). "What must be intended is the conduct, not the resulting harm." Id. at 398. "The Commonwealth may prove wanton or reckless

conduct under a subjective standard, based on the defendant's specific knowledge, or an objective standard, based on what a reasonable person should have known under the circumstances." Guaman, supra.

In the present case, a rational trier of fact could have found beyond a reasonable doubt that the defendant intentionally drove the black Nissan in a wanton or reckless manner. Indeed, the judge credited the testimony of the various eyewitnesses who observed the defendant's reckless operation of the black Nissan and the crash itself. She also credited the testimony of the Commonwealth's accident reconstruction experts and found that the evidence showed that the defendant "operated his motor vehicle in a continuously reckless manner during the seven to eight minutes it took him to drive from [the area where the first witnesses observed his erratic operation] to where Trooper Clardy's cruiser and the Chevrolet Tahoe were stopped." The judge further found as follows:

> "With either indifference to or in disregard of the grave risk of harm to others on the road, [the defendant] drove at excessive speeds, tailgated at excessive speed, passed vehicles, and attempted to pass vehicles in [an] extremely dangerous manner by passing too closely and weaving in and out. He continued to speed and then pass other vehicles with conscious disregard to obvious hazards, including Trooper Clardy's Cruiser with his flashing blue lights. Without slowing down or signaling, [the defendant] recklessly crossed three lanes of traffic at [eighty] miles per hour, all the way into the breakdown lane and at [eighty] miles per hour crashed into the back of the Cruiser. I find, therefore, that he operated his vehicle

in a reckless manner, and therefore, also in a negligent way."

Abundant evidence at trial supported these findings, and we have little difficulty holding that the Commonwealth sustained its burden of proof as to the involuntary manslaughter verdict.  See Commonwealth v. Hardy, 482 Mass. 416, 423-424 (2019); Guaman, 90 Mass. App. Ct. at 41.[9]

3.  Ineffective assistance.  The defendant also claims that his trial attorney rendered ineffective assistance by failing to confront a witness with evidence suggesting a "pro-victim/pro-police" bias, and thus the judge abused her discretion in denying his motion for a new trial. The argument is unavailing.

A motion for new trial may be granted only if it appears that justice may not have been done.  See Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001).  Such motions are committed to the sound discretion of the judge, Commonwealth v. Moore, 408 Mass. 117, 125 (1990), and "are granted only in extraordinary circumstances," Commonwealth v. Comita, 441 Mass. 86, 93 (2004).  "Reversal for abuse of discretion is particularly rare where," as here, "the judge acting on the motion was also the trial judge" (citation omitted).

_____

[9] For these reasons, as well as those discussed supra, we reject the defendant's claim that the conviction for involuntary manslaughter cannot stand because the Commonwealth failed to disprove accident.  See generally Commonwealth v. Figueroa, 56 Mass. App. Ct. 641, 648-650 (2002).

Commonwealth v. Prado, 94 Mass. App. Ct. 253, 255 (2018). Where, as here, a motion for a new trial is based on ineffective assistance of counsel, the defendant must show that the behavior of counsel fell measurably below that of an ordinary, fallible lawyer and that such failing "likely deprived the defendant of an otherwise available, substantial ground of defence." Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). See Commonwealth v. Millien, 474 Mass. 417, 432 (2016) (second prong of ineffective assistance test met if there is substantial risk of miscarriage of justice arising from counsel's failure).

As discussed above, two witnesses testified at trial to the erratic and reckless operation of the black sedan by a dark-skinned man on route 90, east of the crash site, some minutes prior to the crash. On appeal, the defendant argues that his trial counsel was ineffective in failing to impeach one of those witnesses, Brattlof, with the fact that approximately one week after the incident he posted on the social networking website Facebook an image of a State police badge with a black mourning band. The defendant contends that this display of sympathy revealed Brattlof's motivation to aid the prosecution and explained why his recollection of events, such as his description of the defendant and description of the vehicle driven by the defendant "improved over time."

"In general, failure to impeach a witness does not prejudice the defendant or constitute ineffective assistance." Commonwealth v. Bart B., 424 Mass. 911, 916 (1997).  See Commonwealth v. Fisher, 433 Mass. 340, 357 (2001) ("Impeachment of a witness is, by its very nature, fraught with a host of strategic considerations, to which we will, even on § 33E review, still show deference").  See also Commonwealth v. Wall, 469 Mass. 652, 663-664 (2014).  The strategic considerations are particularly fraught where, as here, the impeachment would necessitate that defense counsel put before the trier of fact evidence that could evoke sympathy for the victim.  See Commonwealth v. Pillai, 445 Mass. 175, 187 (2005).

Here, even assuming without deciding that trial counsel's failure to impeach Brattlof with his Facebook page material fell measurably below that of an ordinary fallible lawyer, the judge did not abuse her discretion in determining that this shortcoming did not deprive the defendant of an otherwise available, substantial ground of defense.  As the judge noted in her denial of the motion for a new trial, the record demonstrates thoughtful and thorough cross-examination throughout trial by defense counsel.  This included the cross-examination of Brattlof, which established that he was not positive that the vehicle he saw before the crash was the vehicle "involved in the accident"; that he was unsure of the

model of the vehicle he had seen; and that he had provided varying descriptions of the driver's hair over time.  See Commonwealth v. Strickland, 87 Mass. App. Ct. 46, 62 (2015) (noting defense counsel's effective cross-examination of witness despite failure to impeach her with certain evidence).  Moreover, there was no dispute that the defendant drove the vehicle that crashed into Trooper Clardy's cruiser, and the testimony of Brattlof was corroborated by Janko as well as through detailed circumstantial evidence regarding the defendant's locations and travel times on route 90.  See note 4, supra.  In addition, the evidence against the defendant was very strong.  See Wall, 469 Mass. at 665 (second prong of ineffective assistance test not met where, inter alia, "weight of the evidence against the defendant was overwhelming").  In sum, we cannot say that defense counsel's alleged failure to impeach Brattlof with his Facebook post created a substantial risk of a miscarriage of justice.  See Fisher, 433 Mass. at 357 ("it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion").  Therefore, the judge did not abuse her discretion in denying the motion for a new trial.

Conclusion.  The judgments of conviction of the lesser offenses of motor vehicle homicide and operating to endanger are reversed, the verdicts are set aside, and judgments shall enter

for the defendant.  The judgments of conviction of manslaughter and operating an uninsured motor vehicle are affirmed.  The denial of the defendant's motion for a new trial is affirmed.

<u>So ordered</u>.